UNITED STATES of America,
Appellant,

v.

Joseph F. X. McNALLY a/k/a
"Pope" McNally, Appellee.

No. 72-1297.

United States Court of Appeals,
Third Circuit.

Argued Nov. 2, 1972.

Decided Jan. 15, 1973.

William D. Hyatt, Tax Division, Dept. of Justice, Washington, D. C., for appellant.

Meyer A. Bushman, Philadelphia, Pa., for appellee.

Before FORMAN, ADAMS and MAX ROSENN, Circuit Judges.

OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal, in which the government challenges a suppression of evidence ordered by the district court, 338 F.Supp. 341, forces us to peer once again into the murky area surrounding the precepts governing averments necessary for a finding of probable cause, the basic component that permits a search warrant to issue.

The Fourth Amendment commands:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

▮ A significant number of United States Supreme Court cases[1] require

1. *See e. g.*, United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684

that, if a statement made by an unidentified informer is to be an element in the determination of probable cause, the importance of the statement and the weight to be accorded it in that determination must be analyzed carefully.[2] Thus the task facing the Court in this case is to ascertain whether the affidavit, produced to support the issuance of the search warrant, containing, *inter alia,* a statement by two unidentified informers, provided a sufficient basis for a finding of probable cause to search a property at 3039 Belgrade Street, Philadelphia.

## I.

Defendant Joseph F. X. "Pope" McNally was indicted on seven counts of (a) failing to file income tax returns and (b) filing fraudulent tax returns for the years 1963–1966, on income totaling $833,055.17. The charges were based primarily on evidence gathered at a house located at 3039 Belgrade Street, occupied by McNally's mother. That evidence, implicating McNally in a wide-ranging wagering operation, was seized in a search conducted pursuant to a warrant. It was this warrant that was successfully attacked in the district court.[3]

The affidavit submitted to the magistrate in support of the warrant indicated an extensive system of numbers gambling and horse race wagering. The betting operation described, situated in the Richmond section of Philadelphia, Pennsylvania, was quite active, employing techniques typical of such an enterprise. This much of the affidavit is not in contention. Rather, the controversy turns on the allegations identifying McNally as the "banker" and establishing a nexus between his activity and 3039 Belgrade. The averments include statements that:

(1) "Confidential information was received from two confidential sources, proven reliable in the past, that a large scale wagering operation was being conducted in the Richmond section of Philadelphia, and the 'banker' of this operation was Joseph 'Pope' McNally."

(2) McNally had been arrested fifteen times and convicted six times for numbers violations.

(3) McNally was observed driving in a surreptitious manner on several occasions.

(4) McNally was seen carrying a brown paper bag on two occasions.

(5) Several conversations were overheard by special agents in which reference was made to the leader of this operation, referred to as "Pope."

(6) McNally appeared several times in various taverns in which special agents had placed bets.

(7) McNally visited the house searched, 3039 Belgrade, the home of his mother, ten times within a two-month period under questionable circumstances.

The district court, holding United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), not controlling, considered itself bound by what it referred to as "the somewhat unrealistic standards" required by Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

Focusing on the allegations linking McNally to the gambling operations and finding them inadequate to establish probable cause to suspect that McNally was the "banker" of the business, the

---

(1965); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); and Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

2. The decision whether a warrant shall issue must be made, in the first instance, by a neutral and detached magistrate, someone independent of the police and prosecution. *See* Shadwick v. City of Tampa, 407 U.S. 345, 348 (1972) and cases cited therein. The Federal Magistrates Act of 1968 requires that full-time U.S. Magistrates be legally trained. 28 U.S.C. § 631(b)(1).

3. McNally asserts his standing to challenge the search and seizure based on his presence on the premises at the time of the search. Jones v. United States, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

district court did not go on to consider whether the affidavit provided any indication that 3039 Belgrade was the locus of criminal activity because it did not find that McNally, himself, was involved in criminal activity.

## II.

Before commencing an inquiry into the sufficiency of the affidavit, it is important to note the presumptions with which reviewing courts are directed to approach such an examination:

".  .  .  that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, Beck v. Ohio, 379 U.S. 89, 96, [85 S.Ct. 223, 13 L.Ed.2d 142] (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, McCray v. Illinois, 386 U.S. 300, 311, [87 S.Ct. 1056, 18 L.Ed.2d 62] (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, United States v. Ventresca, 380 U.S. 102, 108, [85 S.Ct. 741, 13 L.Ed.2d 684] (1965); and that their determination of probable cause should be paid great deference by reviewing courts, Jones v. United States, 362 U.S. 257, 270–271 [80 S. Ct. 725, 4 L.Ed.2d 697] (1960)."[4]

The first step in the analysis is to determine whether the finding of probable cause is based on the informant's tip alone, the tip plus evidence corroborating the tip, or the tip and other incriminating evidence. If the tip alone or the tip plus corroboration of the tip are the sole grounds for the finding by the magistrate of probable cause, then *Spinelli* and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), demand that the tip or the tip plus corroboration meet certain standards. The

trial judge found no evidence beyond the tip from which a link between McNally and the numbers operation could be forged. Having reached this conclusion, he then measured the tip against the *Aguilar* and *Spinelli* standards and held that no basis for probable cause existed. He concluded, "[N]o nexus had been shown connecting the defendant with the operation in question other than unsubstantiated rumor."

In *Aguilar* the Supreme Court was asked to determine whether a warrant could issue based on an affidavit that alleged only:

"Affiants have received reliable information from a credible person and do believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law."[5]

The *Aguilar* Court found the warrant had been issued improperly, pointing at two crucial inferences that had been made by the police, not the "neutral, detached" magistrate. First, the affidavit did not reveal to the magistrate any of the basis from which the informer concluded that the contraband, illegal activity, or evidence thereof, could be found in a certain area. Second, no evidence was offered the magistrate as to how the police knew that the informer was "a credible person."

In *Spinelli*, however, the Court defined the use that could be made of evidence beyond the tip contained in the affidavit, including evidence intended to substantiate the informer's tip. The Court made its re-definition in the context of the following allegations:

(1) The FBI "had been informed by a confidential reliable informant" that Spinelli was operating a wagering operation from two telephones, the numbers of which the informer also supplied.

---

4. Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

5. Aguilar v. Texas, 378 U.S. 108, 109, 84 S.Ct. 1509, 1511, 12 L.Ed.2d 723 (1964).

(2) Spinelli had been observed by the FBI for five days during August, 1965. On four of the days he was seen crossing from Illinois to Missouri at noontime and entering an apartment building in the late afternoon. On one of the afternoons he was followed into the building where he was observed entering a specific apartment.

(3) A check with the telephone company revealed that the telephone numbers supplied by the informant were listed at the apartment Spinelli had been seen to enter.

(4) A statement that "Spinelli is known to this affiant and to federal law enforcement agents and local law enforcement agents as a bookmaker, an associate of bookmakers, a gambler, and an associate of gamblers."

■ In holding these allegations insufficient to support a search warrant, the Supreme Court tested the warrant through the following procedure: It first determined that "[T]he tip [,] has a fundamental place in this warrant application. Without it, probable cause could not be established." [6] Since the tip was essential to a finding of probable cause, it was then lined up against *Aguilar*. Finding the tip obviously inadequate to meet the two prongs of the *Aguilar* test, the Court then turned to the additional allegations. The latter allegations, the Court stated, could be used to corroborate the tip, to bring it up to a level of reliability satisfying both branches of *Aguilar*. Thus, the material outside the tip could be used to support a magistrate's conclusion both that the informer had a reasonable and legitimate basis for his statement that linked defendant to criminal activity and that the police had reason to credit the informer. Pointing to Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed. 2d 327 (1959), the Court held that a tip that included a plethora of detail might provide the necessary corroboration.[7]

■ The Supreme Court also made clear that assertions of unsavory reputation regarding the target of the search, without more, were to be disregarded.

Testing the affidavit in *Spinelli* against these criteria, the Supreme Court found the information beyond the tip inadequate to bring the tip up to the level of reliability required in *Aguilar*.

The tip proffered in United States v. Harris, *supra*, was far more detailed than those in either *Aguilar* or *Spinelli*. The tip's adequacy to satisfy the *Aguilar* requirement that the basis for the informer's statement be clear was not the contested issue in *Harris*. Rather, the case turned on the second branch of the *Aguilar* test: the justification for the authorities' reliance on the informer. The opinion of Chief Justice Burger,[8] holding that the second branch of the *Aguilar* test was met, clearly indicates a diminution of the requirement *Spinelli* imposed on that branch of the test. Moreover, in its language and tenor, the *Harris* opinion indicates a loosening of the rigid strictures of *Spinelli*.[9] Nonetheless, *Harris* did not overrule *Spinelli*,[10] and in testing the sufficiency of the affidavit in the present appeal,

---

6. Spinelli v. United States, 393 U.S. 410, 414, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969).

7. In *Draper*, an informer advised the authorities that a certain gentleman, whose dress, gait and luggage he described, would be arriving on one of two trains, carrying a quantity of heroin. When a man precisely fitting this description did appear, he was arrested, and a search pursuant to the arrest yielded the heroin. Against a challenge by the defendant, the Court held that there was probable cause for the arrest.

8. There was no majority opinion in *Harris*. Rather, various parts of the Chief Justice's opinion were joined by different Justices producing a majority for the decision but not an Opinion of the Court.

9. *See*, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 38, 53–64 (1971).

10. *See* United States v. Harris, 403 U.S. 573, 585, 91 S.Ct. 2075, 29 L.Ed.2d 723 (Black, J., concurring) and *id.* at 585–586, 91 S.Ct. 2075 (Blackmun, J., concurring).

the general pattern described in *Spinelli* must therefore be followed.

Returning then to *Spinelli,* two aspects of that decision need further explication. The Supreme Court, reversing the decision of the Eighth Circuit, rejected the "totality of circumstances" approach that had been employed. As described by the Supreme Court, the "totality" approach has a certain self-reinforcing quality. "[T]he informant's tip gives a suspicious color to the FBI's reports detailing Spinelli's innocent-seeming conduct and that, conversely, the FBI's surveillance corroborates the informant's tip, thereby entitling it to more weight." [11]

■ By rejecting this mode of analysis, the Court has made clear that unless the tip satisfied the *Aguilar* standard, innocent-appearing conduct must be presumed innocent and cannot be an element in the determination of probable cause. Thus, the facts that there were two telephones in the apartment visited by Spinelli and that he traveled to and from the specific apartment could not be considered as bases for probable cause. However, the requirement regarding innocent-appearing conduct obviously does not cloak suspicious conduct with an aura of innocence. Also, nothing in *Spinelli* holds that suspicious conduct cannot play a role in a determination of probable cause.

■ Further, the *Spinelli* opinion does not rule out completely the use of a tip that does not meet the *Aguilar* standards. Rather, it permits the use of a tip not meeting the *Aguilar* standards, if there are, in the affidavit, other indicia of criminal activity. Thus, a deter-

mination of probable cause resting on a tip plus other non-innocent conduct is proper, even if use of the tip, were it the only basis for a finding of probable cause, would be improper.

"We conclude, then, that in the present case the informant's tip—even when corroborated to the extent indicated—was not sufficient to provide the basis for a finding of probable cause. *This is not to say that the tip was so insubstantial that it could not properly have counted in the magistrate's determination.* Rather, it needed some further support. When we look to the other parts of the application, however, we find nothing alleged which would permit the suspicions engendered by the informant's report to ripen into a judgment that a crime was probably being committed." [12] (emphasis added.)

### III.

■ Having expounded the standards against which an affidavit in support of a search warrant must be measured, it remains to determine if the allegations in support of the warrant here comport with such standards. First, it is clear that the tip, by itself, does not meet the *Aguilar* test, since it lacks any foundation from which a magistrate could make the two inferences he is required to make. Second, it is also manifest that if the tip plus corroboration were the sole basis for a finding of probable cause, the affidavit here would also fail the *Spinelli* test.[13] However, the tip is not the only basis upon which probable cause might be grounded in this case. Thus, the tip and the other independently suspect activity must be examined

---

11. Spinelli v. United States, 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969).

12. *Id.* at 418, 89 S.Ct. at 590. *But see,* United States v. Harris, 403 U.S. 573, 587, n. 1, 91 S.Ct. 2075, 29 L.Ed.2d 723 (Harlan, J., dissenting).

13. The tip in this case provided a dearth of detail implicating McNally, stating only the critical fact that he was the

banker of the gambling operation. A search for evidence to "corroborate" this tip is a fruitless effort, for the only thing to corroborate is the basic allegation that McNally is a gambler, and evidence corroborative of that allegation would also be evidence which could independently support a finding that McNally was participating in criminal activity. Therefore, the "tip plus corroboration" approach is not apposite to this case.

and, if together they establish probable cause, then the search warrant was properly issued.

At the outset of this examination, it is important to note that McNally was suspected of being the banker of the numbers operation. As banker, he was the director of the activity operating behind the scenes, not a visible worker as a numbers writer might be. Therefore, he was able to maintain a very low silhouette and refrain from most conduct which could be an overt indication of his illegal enterprise.

However, there are allegations of suspicious conduct by McNally, actions which remain suspicious even when viewed from *Spinelli's* command that innocent-appearing conduct be presumed innocent. Among these are the furtive driving techniques and frequent meetings with known gamblers. There is also a reference to "Pope" by a person with whom an agent had just placed a bet, a reference that indicates that "Pope" was the head of the operation in which the bet-taker was involved. It is clear that taken alone, each of these allegations would be inadequate to support a finding of probable cause; yet each is indicative of illegal activity by the defendant. For example, evasive driving has been held to be conduct that may be considered in a finding of probable cause. *See* United States v. Squella-Avendano, 447 F.2d 575, 582 (5th Cir.), cert. denied, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971).

Beyond these assertions, there is the extensive criminal record of McNally. Although *Harris* indicates that a defendant's *reputation* for illegal activity may be accorded weight, the trial court here held that "prior arrests and convictions cannot be considered tantamount to a 'law enforcement officer's knowledge of a suspect's reputation.' Therefore, a defendant's prior criminal record is entitled to little weight." It must be recalled, however, that McNally had been arrested fifteen times and convicted six times for gambling offenses. To hold that past convictions are less reliable than a "law enforcement officer's knowledge of a suspect's reputation" would appear illogical.[14]

■ It may well be that, taken either together or individually, these averments in the affidavit fall short of establishing adequate grounds for believing that McNally is engaging in illegal activities. Nonetheless, they do not describe innocent-appearing conduct, but rather suspicious conduct. When the information received from the confidential sources is added to the other allegations, and all are considered together,[15] as they may be, the allegations are sufficient to link McNally in a meaningful way to the gambling operation.

The trial judge, apparently believing that he had to consider each element of the affidavit separately, and thus not finding the needed link, did not go on to consider whether the activity in the vicinity of 3039 Belgrade was indicative of criminal conduct. Rather, he "reluctantly" granted defendant's motion to suppress the evidence seized at that address.

## IV.

Having established that the affidavit permits a finding that one could reason-

---

14. In Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), the Supreme Court indicated that the fact a law enforcement officer had arrested a suspect several months earlier was to be considered in a determination of probable cause, there for a warrantless arrest and incident search. Moreover, the Court indicated that the one arrest was at least as probative as defendant's general reputation. 338 U.S. at 170, 69 S.Ct. 1302, 93 L.Ed. 1879. In *Harris*, too, the prior arrest of the defendant, not by the affiant but by a local law officer, was held to be properly considered. 403 U.S. at 582–583, 91 S.Ct. 2075, 29 L.Ed. 2d 723.

15. It is important to bear in mind that this approach is not the "totality of circumstances" approach condemned in *Spinelli*. Rather, this is an approach that considers only suspicious conduct as a basis for probable cause.

ably suspect that McNally was the banker of the operation, the inquiry must then be shifted in order to ascertain whether there was a sufficient basis to find probable cause for the search of 3039 Belgrade. The necessity of examining the personal culpability of McNally arises from the particular facts of this case. Without a basis for believing that McNally was involved in a gambling operation, it might be contended that probable cause to search would be lacking here. This is not to suggest that every search warrant must be analyzed through this two-step procedure. Indeed, in a significant number of cases probable cause might well be established to suspect that illegal activity, evidence thereof or contraband, was at a given location without implicating any particular person.

Before initiating the rigorous examination of the affidavit necessary to determine whether there was probable cause to search the specific address, it must be noted that in *Spinelli,* a case in which the challenged warrant, as here, was a search warrant and not an arrest warrant, the inquiry regarding sufficiency, nevertheless, examined the personal culpability of Spinelli, *i. e.,* whether Spinelli was, indeed, a bookmaker, not whether bookmaking was being conducted at the address to be searched and for which the warrant was issued.[16] The affidavit in *Spinelli* dealt only with Spinelli and his activities around a certain apartment, thus perhaps explaining the Court's focusing on the person not the place. Finding that

McNally's activities in and around 3039 Belgrade are involved in the determination of probable cause to search the place, and that his actions might not be suspect in and of themselves, the Court, here, has had first to scrutinize the allegations involving McNally. This inquiry has produced an ample quantum of credible allegations to support a belief that McNally is the banker of this operation. From this basis, it remains to trace McNally's activity as it pertains to 3039 Belgrade.

Before detailing the number of times and the circumstances under which McNally was seen at 3039 Belgrade, the role of that house in the operation must be briefly set out. 3039 Belgrade was described as the "bank" of the operation. As such, it was a depository for records as distinguished from the "offices," the operational centers of the enterprise.[17] Therefore, there would be a lesser amount of activity at 3039 Belgrade, comings and goings only for the purpose of completing the record-keeping operation.

The affidavit details 10 times in which McNally visited 3039 Belgrade during the period from May 24 through July 26, 1967.[18] On four of these occasions, June 5, June 7, July 7 and July 14, there were no indications of suspicious activity. On May 26, the first time that McNally was seen at 3039 Belgrade, he entered with a brown paper bag and paper.[19] Thus, having accounted for 5 of the 10 visits, the other 5 visits remain, all of which took place in July of 1967 and all of which are

---

16. "The tip does not contain a sufficient statement of the underlying circumstances from which the informer concluded that Spinelli was running a bookmaking operation. We are not told how the FBI's source received his information— it is not alleged that the informant personally observed Spinelli at work or that he had ever placed a bet with him." Spinelli v. United States, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1968).

17. Search warrants were issued for several of the suspected "offices" as well as 3039

Belgrade Street. The execution of a warrant at McNally's residence, 7812 Revere Street, failed to produce any evidence of gambling.

18. McNally was not under constant surveillance during this two-month period. Thus, it cannot be said that he visited the house only ten times, or that he visited the house unobserved more than ten times.

19. It is not clear from the affidavit whether the brown paper bag being carried by McNally on this date was a container of records or merely the bag in which the writing paper had been placed.

suggestive of suspicious activity. For example, on July 12, McNally went from an address believed to be one of the offices of the operation to 3039 Belgrade. He remained there for but 3 minutes and then proceeded to the 2400 Bar, a bar at which bets had been placed by undercover agents. On July 17, one of McNally's alleged lieutenants, believed to be John "Pickles" Millevoi,[20] was seen entering 3039 Belgrade, being admitted by McNally. Approximately one hour later, McNally, having left the house unobserved, was seen to re-enter the house at 5:20 P.M.

On July 18th, McNally left early in the morning from 3039 Belgrade and proceeded to his residence at Revere Street. As he entered his residence, believed to be one of the offices of the operation, he was carrying a small white paper bag. Paper bags have been described by another court as "a hallmark of the calling." [21] Later that same day, one of McNally's lieutenants appeared at 3070 Livingston Street, entered, then proceeded to leave that house and to stop at several of the bars described as places where McNally's numbers writers operated. He then returned to Livingston Street where he was met by McNally. In the late afternoon, McNally's car was observed back at 3039 Belgrade Street.

On July 19th, McNally and his lieutenant departed from another office of the enterprise, again carrying the "hallmark" brown paper bag. They proceeded to drive in a surreptitious manner to 3039 Belgrade. Later that same day another lieutenant, one Mary Daly, entered 3070 Livingston Street, another of the offices, carrying with her indicia of the enterprise. Shortly after her arrival, McNally and the man identified as Millevoi departed and drove immediately to the Belgrade Street address, entered the house, then drove from the area, again in a surreptitious manner.

Finally, on July 20th, McNally's lieutenant, Millevoi, was observed making stops at some of the taverns in which McNally's numbers writers were stationed. Later in that afternoon, McNally, himself, was seen leaving with Millevoi from the 2400 Bar, driving to another bar and entering a third bar, Mahoney's Bar. Upon leaving Mahoney's Bar, they proceeded immediately, although surreptitiously, to 3039 Belgrade.

Recapitulating then, there are more than 4 occasions at which McNally stopped at 3039 Belgrade during the day, in fact during numbers-writing hours, in the company of known gamblers. This raises at least the inference that these visits were not visits of a solicitous son to his mother, but rather visits in the course of maintaining records of McNally's illegal enterprise.

■ Thus, because the affidavit provides a basis to suspect that McNally was, indeed, the "banker" of this numbers operation, we have looked at the allegations contained in the affidavit concerning his visits to 3039 Belgrade. Having done so, we find that one could reasonably believe that this address was the location of records and paraphernalia relating to the gambling enterprise. Finding that probable cause existed for a warrant to search 3039 Belgrade, we hold that the suppression of evidence ordered by the distinguished district court was in error and, therefore, should be reversed.

## V.

■ Though we set aside the suppression of the evidence in this case, we do so with full awareness of the history surrounding the Fourth Amendment and

---

20. The affidavit identified McNally's lieutenant as Mr. Millevoi. At the time that the search was conducted at 3039 Belgrade, it was discovered that the aide had been incorrectly identified and that in fact, he was one Robert Miller.

21. Carter v. United States, 231 F.2d 232, 234, (5th Cir.), cert. denied, 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498 (1956). See Wingo v. United States, 266 F.2d 421 (5th Cir., 1959).

the high station accorded that Amendment in the body of our liberties. An appeal in a case such as that presently before the Court confronts us with two objectives: protection of individual rights from unjustifiable governmental intrusion and protection of society as a whole from those who, by flouting its laws, diminish those laws and the security they seek to bring. The Fourth Amendment balances these two aspirations by mandating that "no Warrants shall issue, but upon probable cause." To construe the "probable cause" requirement in an unduly formal or unrealistic manner upsets the equilibrium achieved in the Fourth Amendment. An affidavit in support of a search warrant is not "to be judged as an entry in an essay contest" but is entitled to a "common-sense evaluation." [22] To require suppression in this case would be to deny common sense and shift the fulcrum of the scale in favor of one offender and against society. Such a shift, though in the short run perhaps a defeat of authority, would be no gain for liberty.

An order will be entered reversing and remanding the case to the district court for proceedings in conformity with this opinion.

---

22. Spinelli v. United States, 323 U.S. 410, 438–439, 89 S.Ct. 584, 21 L.Ed.2d 637 (Fortas, J., dissenting).