UNITED STATES of America, Plaintiff-Appellee,

v.

John Michael CHESTER

and

Robert Byron Watson, Defendants-Appellants.

No. 75–2457.

United States Court of Appeals, Fifth Circuit.

Aug. 18, 1976.

Rehearing and Rehearing En Banc Denied Sept. 27, 1976.

174

Roman A. DeVille, Atlanta, Ga., for Chester.

Glenn Zell, Hudson John Myers, Atlanta, Ga., for Watson.

John W. Stokes, U. S. Atty., James E. Fagan, Jr., Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before MORGAN, CLARK and TJOFLAT, Circuit Judges.

MORGAN, Circuit Judge.

A federal court jury found appellants Chester and Watson, along with one other defendant, guilty of possession of cocaine with intent to distribute, distribution of cocaine, and conspiracy to do those illegal acts.[1] Appellant Chester also was convicted of possession of marihuana with intent to distribute.[2] Three other defendant co-conspirators entered guilty pleas on some or all of the charges. Only Watson and Chester have appealed.

Watson argues that there was insufficient evidence to support his conviction,

---

1. 21 U.S.C. §§ 841, 846.

2. 21 U.S.C. § 841.

that his attorney afforded him ineffective assistance of counsel, that it was error to deny his motion for severance, and that it was error to admit certain taped conversations. We find all of these contentions to be without merit and affirm his conviction.[3] Chester contends that he was convicted on the basis of evidence illegally seized from his residence and that, even if the search was lawful, there was insufficient evidence to support his conviction. We reject Chester's arguments and affirm his conviction as well.

## I. Probable Cause to Search Chester's Residence.

 A probable cause issue can rarely, if ever, be resolved with the exact logic of a Euclidean theorem. Each case must turn on its facts. Some guideposts, however, are available to a reviewing court. Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause. *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The issuing magistrate is not to be confined by niggardly limitations or by restrictions on the use of his common sense. *Id. See United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). And the magistrate's determination of probable cause should be paid great deference on appeal. *Spinelli v. United States, supra,* at 419, 89 S.Ct. 584; *Jones v. United States,* 362 U.S. 257, 270–71, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

 Judged by these standards, the magistrate's finding of probable cause to search Chester's residence should be sustained. The affidavit, reproduced in the margin,[4]

---

**3.** The evidence shows that Watson was the middle man for the whole drug transaction. He was the one who initially contacted the undercover agent and asked him if he wanted to purchase the cocaine. He introduced the agent to the other defendants and requested a fee when the first sale was consummated. He was present during the negotiations leading up to both of the sales. The evidence of his guilt is simply overwhelming, and there is nothing in the record to support any of the enumerated grounds of appeal.

**4.** "(1) On January 8, 1975, S/A Gerald D. Chapman, acting in an undercover capacity, met with William Scott Boyd, Robert Byron Watson, and Thomas Fred Rauschenberg at Aunt Charley's in the Buckhead district of Atlanta, Georgia, where S/A Chapman discussed the purchase of two (2) pounds of cocaine. Robert Byron Watson described the cocaine to be sold to S/A Chapman and explained how the distribution would take place.

"(2) After an agreement was reached, S/A Chapman and the others proceeded to South Fulton County where Rauschenberg called his "man" who said that on that day he would do (sell) one ounce of cocaine and that if the transaction went smoothly, he would distribute the remainder.

"(3) Shortly thereafter, S/A Chapman, Rauschenberg, and William Scott Boyd proceeded to the Grant City parking lot on Old National Highway where they rendezvoused with a red Volkswagen occupied by a white male later identified as Phillip Steadham. Steadham advised there were police in the area and that Rauschenberg and the others should follow him.

"(4) They drove a short distance away and S/A Chapman observed Rauschenberg exit their vehicle and enter the red Volkswagen occupied by Steadham and return shortly with one ounce of cocaine, which Rauschenberg delivered to S/A Chapman. S/A Chapman paid $1,800.00 in official government funds, the serial numbers of which had been recorded, to Rauschenberg.

"(5) On January 9, 1975, S/A Wayne Smith, having traced the registration of the red Volkswagen and having ascertained the present residence of the registered owner, observed the same red Volkswagen at 6:00 p. m. at the Embarcadero Apartments in Atlanta, Georgia.

"(6) At approximately 8:15 p. m., Rauschenberg advised S/A Chapman that "his man" had 20 ounces of cocaine, that they would deliver 8 ounces and that if that went smoothly they would deliver another 8 ounces.

"(7) At about the same time, S/A Smith observed the red Volkswagen leave the Embarcadero area and proceed to 3238 Stratford Arms Drive, DeKalb County, Georgia.

"(8) Steadham entered 3238 Stratford Arms Drive, DeKalb County, Georgia, address and thereafter other vehicles including a Pinto with Virginia plates arrived and departed. Later so did Steadham in the red Volkswagen. Shortly thereafter, agents observed the Pinto return to 3238 Stratford Arms Drive, DeKalb County, Georgia, and thereafter saw Steadham return in the red Volkswagen and park about one fourth of a mile away, where they observed Steadham make a telephone call. Immediately thereafter, the Pinto left the residence, picked up Steadham, and proceeded to Broadview Shopping Center parking lot where Rauschen-

revealed the following: The drug enforcement agents knew that a red Volkswagen they were watching was the vehicle used to deliver cocaine in a "buy" a day earlier. At almost the same time that the drug peddlers informed the undercover agents that another delivery was imminent, the red Volkswagen left the apartments where it was parked and went to Chester's residence. The magistrate surely could infer that the decision to deliver more cocaine triggered the Volkswagen's journey.

Steadham, the driver of the Volkswagen, who had acted as delivery boy for the cocaine on the previous day, went into the residence. Other cars came and went, including a Pinto with Virginia plates. Then the red Volkswagen and its driver left.

The Pinto returned and later, so did the Volkswagen, but not quite. It parked a quarter mile from the residence and its driver made a telephone call. The Pinto then left the residence and picked up Steadham. The Pinto proceeded to the new cocaine delivery.

The drug peddlers had made it clear that this new delivery of eight ounces of cocaine would be followed by yet another delivery if things went smoothly.

Chester argues that the affidavit does not focus enough suspicion on his residence to justify its search as the probable site of the cocaine cache. It seems clear, however, that the magistrate could *reasonably* conclude that the cocaine was *probably* at that site. No more is necessary to justify a warrant. *See, e. g., United States v. Melancon*, 462 F.2d 82, 89 (5th Cir.), *cert. denied*, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972).

No doubt the cocaine could have been somewhere else, but the *possibility* that the cache was at any of several other places does not negate the *probability*, as found by the magistrate, that the appellant's residence was the true location. To list several alternative hypotheses regarding the source of the eight ounces and then conclude that it does not necessarily follow that the Stratford Arms residence contained the cache misconceives the nature of the probable cause inquiry.

■ The test we must apply is not whether the affidavit's hypothesis *necessarily* follows, but whether the magistrate could reasonably conclude that it probably follows.

The magistrate could reason that neither Steadham's apartment nor the red Volkswagen itself contained the cocaine on the basis that Steadham must not have been in possession of the drug when he left his apartment, else why did he not drive directly to the drop point? The delivery had already been promised at the time he left his apartment and Steadham realized that the buyers knew he was the source and that he drove a red Volkswagen. Another possibility, the Pinto, raises the question of why a transfer to Steadham was not made on the first occasion when both Steadham and the Pinto were together at the Stratford Arms Drive address. In fact, the departure of both vehicles from the house and their subsequent covert rendezvous could have been considered by the magistrate to be part of a ruse to divert attention away from the house. The affidavit's mention of the departure of a gray Pontiac from the residence after the Pinto had left really is too equivocal to make it a prospect.

■ The implication of Chester's contention that not enough was known about the residence is that the officers should have provided the magistrate with some information about the occupants of the residence or about previous illegal activities there. Such information was not required. *See United States v. Salas*, 488 F.2d 939 (5th Cir. 1974).

berg delivered 8 ounces more or less of cocaine to S/A Chapman.

"(9) After the cocaine was delivered to S/A Chapman, DEA Agents arrested Phillip Mahlon Steadham and Joseph Earl Brown, who was driving the Pinto.

"(10) Agents field tested the substances delivered on both occasions, and the tests showed a positive reaction for cocaine.

"(11) At the time of the departure of the Pinto from the 3238 Stratford Arms Drive address, DEA agents observed a 1974 gray Pontiac leave the same address."

## II. Sufficiency of the Evidence.

■ Chester's sufficiency argument is dependent upon the proposition that the government could show no more than "mere presence" at the residence during the time that the incriminating evidence was discovered there. The factual basis for the "mere presence" argument is that Chester shared the residence with one Ron Riley.

The marked money upon which the government relied heavily for some of the counts of the indictment was found in the bedroom that was allegedly Riley's. In Chester's bedroom agents found scales commonly used by narcotics traffickers to measure quantity. In common areas of the house, agents found implements for "cutting" cocaine and also a large amount of marihuana.

With respect to the marihuana found in the common areas of the house, the nexus with Chester is relatively easy to sustain. When agents asked him whether the substance was five pounds of marihuana, Chester replied that it was three pounds of marihuana. The scales found in Chester's bedroom further bind him to the marihuana.

The finding of Chester's possession of the cocaine "cutting" implements and, more crucially, of the marked money is more difficult to sustain. Here the alleged shared occupancy of the residence comes into play.

The evidence with respect to Riley's occupancy is confused. Although Riley himself apparently was available to testify, neither side called him. Defense witnesses testified that Riley had recently occupied the residence, but no testimony placed Riley as a resident of the house during the crucial time frame which included the narcotics buys, the surveillance of the house, and the search. One defense witness, a neighbor, testified that, although he had seen Riley several times on previous occasions, he could not remember seeing Riley or his car at the house at all in 1975. The drug "buy" which generated the marked money occurred in January, 1975. Chester himself testified that Riley was out of town most of the time and was not at the house during the afternoon and night of January 9, the date of the eight ounce cocaine transaction.

Chester's theory about the presence of the money, the marihuana, and the cocaine "cutting" implements pretty clearly did not include the proposition that Riley was the culprit. Chester denied that the marihuana or the implements belonged to Riley. As for the money, Chester's theory seemed to be that the traffickers, who visited him on January 9, inexplicably left the bills under the rug in Riley's bedroom. The trial court found this a curious explanation.[5]

Taking all the testimony together, a reasonably-minded jury could conclude beyond a reasonable doubt that Chester had dominion over the money and the cocaine "cutting" implements during the relevant time

---

5. At one point in the trial the following exchange occurred between the court and Chester:

THE COURT: Do you know whether Mr. Rauschenberg or Mr. Steadham or either one of them, do you know any reason why if they had been engaged in a cocaine transaction on the night of the 8th and had received payment to the tune of twelve hundred dollars in payment therefor, they would choose a rug in one of your bedrooms under which to hide it?

THE WITNESS: No, sir. I don't have any, any knowledge of any—

THE COURT: Well, if your version of this thing is correct, one of the three must have hidden it there.

THE WITNESS: Yes, sir.

THE COURT: Either Rauschenberg, who admits delivering the cocaine and taking the money, or through Rauschenberg to Steadham, and he hid it there, or to Brown and he hid it there.

Do you know any reason why any one of the three of them would pick your bedroom rug to hide his money under?

THE WITNESS: No, sir.

THE COURT: All right.

MR. DEVILLE: Your Honor, I would like for the record to correct, Your Honor, if I might humbly do so.

This was not his bedroom. This was the other bedroom.

THE COURT: All right. Say a bedroom in your house.

Tr., vol. III at 200–01.

period. Thus, the evidence was sufficient. *See United States v. Prout*, 526 F.2d 380, 384 (5th Cir. 1976).

AFFIRMED.

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's opinion in so far as it affirms the conviction of appellant Watson; however, I cannot agree with the portion of the opinion which holds that the magistrate properly determined that the affidavit established probable cause to search appellant Chester's residence.[1] As I read the affidavit, it is totally inadequate to support a finding of probable cause. In my judgment, the rationale of today's decision is that the magistrate's mere suspicion can amount to probable cause. I therefore respectfully dissent.

I

The majority recognizes that to uphold the magistrate's finding that the affidavit[2] in this case established probable cause to search Chester's house one must be able to conclude that, despite the several possible locations of the cocaine cache, Chester's house was probably "the true location." Yet an examination of the affidavit on which the magistrate relied reveals that any conclusion concerning the whereabouts of the drug cache sought by the agents would be pure speculation amounting at best to "reasonable suspicion," which is less than probable cause.[3] *See United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

To appreciate the significance of the different standards it is necessary to examine what the affidavit indicated the affiant did *and did not* know concerning the location of the drug supply. The affidavit states that on the previous day, January 8, an undercover agent, Chapman, purchased one ounce of cocaine with the understanding that the next day he could purchase an additional eight ounces. Chapman was told that the supplier had access to twenty ounces, but the name and residence of the supplier was not revealed. Chapman did know, however, that the one ounce had been delivered by a man driving a red Volkswagen. The license of this car was traced to one Steadham living at the Embarcadero Apartments.

At about 8:00 P.M. the next evening Chapman finalized arrangements for an eight ounce purchase later that night. At the same time officers (who had had the Embarcadero Apartments under surveillance for two hours) observed the red Volkswagen leave the apartments. It is important to note that, as of this moment, the investigation had not disclosed where the drug cache was located. Several *possibilities* were evident at this time. They included Steadham's Embarcadero Apartment, on Steadham's person or in the red Volkswagen, at a place where Steadham might stop en route to his destination, or in any number of other places unknown to the agents. What was known is that Steadham had left his apartment. He was followed to an address on Stratford Arms Drive. The investigators knew nothing about this house or its occupants, and of course the house had not previously been under surveillance. Steadham went in, and then a Pinto and

---

1. As I conclude that there was no probable cause for the search, I do not reach the question of the sufficiency of the evidence and express no view on that portion of the majority opinion.

2. The affidavit is set out in footnote four of the majority opinion.

3. The majority says: "A probable cause issue can rarely, if ever, be resolved with the exact logic of a Euclidean theorem." I suppose they mean by this statement that a practical judgment is involved, and, of course, this is correct;

however, the word "probable" still means that there must be *more* than a "strong reason to suspect." *Henry v. United States*, 361 U.S. 98, 101, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959). Moreover, both the common meaning of the word and judicial authority suggest that the term means "more likely than not." *See, e. g., Graves v. Sheriff*, 88 Nev. 436, 498 P.2d 1324 (1972); *Langford v. Pearson*, 334 S.W.2d 473 (Tex.Civ.App.1960); *State v. Trout*, 74 Iowa 545, 38 N.W. 405 (1888); *Ex parte Souza*, 65 Cal.App. 9, 222 P. 869 (1923).

other vehicles arrived. Nothing was known to the affiant about these vehicles or their drivers. There was also no indication as to whether the drug cache was in the house, in one of the vehicles, on one of their drivers or occupants, at a place where they had been, or even at some other location.

Steadham was then seen leaving the house, and thereafter the Pinto left. They were not followed, and, thus, the affiant could not report where they went or why. Either car, of course, might have gone to pick up the drugs. The house remained under surveillance. The Pinto returned; then Steadham arrived in the Volkswagen and parked at a nearby phone booth. After he had placed a call, the Pinto left the house, picked him up and drove to a rendez-vous point where eight ounces of cocaine were sold to Chapman. With this limited information as to the location of the drug supply, a warrant was sought from a magistrate to search the house on Stratford Arms Drive for the remainder of the twenty ounces that Chapman had been told about on the previous day.

The majority would have us believe that the magistrate who reviewed these facts "could reasonably conclude that the cocaine [cache] was probably at [the Stratford Arms address]." Yet, it is not disclosed how the magistrate could have drawn this conclusion from reading the affidavit. Perhaps it is because the affidavit reveals several possible places, equally plausible, for the cache: (1) Steadham's Embarcadero apartment; (2) the red Volkswagen; (3) the Pinto; (4) the "other vehicles"; (5) the place(s) (unknown) where any of these vehicles may have been before arriving at the Stratford Arms residence; (6) the place(s) (unknown) where the Pinto went after leaving the residence and before returning to pick up Steadham; (7) the place(s) (unknown) where the Volkswagen went after leaving the residence and before going to the phone booth; (8) the house on Stratford Arms; or (9) some other place from which the eight ounces sold to Chapman were brought to either the Embarcadero Apartments or the Stratford Arms address *before*

surveillance began on the evening of the search. I do not see how a magistrate could select one of these possible locations over another as the probable location of the cache. Yet the majority says: "No doubt the cocaine could have been somewhere else, but the *possibility* that the cache was at any of several other places does not negate the *probability*, as found by the magistrate, that the appellant's residence was the true location." I submit that this is a *non sequitur*, for nowhere does the affidavit establish the "probability" to which the majority refers.

Perhaps sensing this failing, the majority attempts to demonstrate the improbability of some of the alternate possible locations of the cache. Steadham's residence is dismissed as a possibility because he is the "delivery boy". Had he been the source, it is reasoned, he would have gone directly to the rendezvous with Chapman. The comings and goings of the vehicles at the Stratford Arms address are dismissed as a "ruse" to draw attention away from the house. These are unsubstantiated hypotheses. Nowhere is Steadham described as the "delivery boy". No reason is given why, if Steadham was the source, he would go directly to the rendezvous with Chapman. No reason is given why the comings and goings of vehicles at the Stratford Arms should be seen as a "ruse". Indeed, why is it not just as likely that Steadham's going to the Stratford Arms house was the "ruse"? The truth is that the majority has found "probable cause" by merely carving hypotheses out of the universe of possible explanations for the events described in the affidavit. This inventive exercise is necessary, of course, for there is no other way to sort through the maze of possibilities presented in the affidavit. Unfortunately, I believe that when the sorting is through one is left without a basis to find probable cause.

II

The inadequacies of the affidavit in this case are highlighted even more dramatically if one looks at the two Fifth Circuit cases relied on by the majority. *United States v.*

*Salas,* 488 F.2d 939, 941 (5th Cir. 1974), involved the stop and search of a car and was characterized by the panel as a "close case". The circumstances were described as follows:

> This is a close case, but we conclude that there was sufficient probable cause—just barely sufficient—to justify stopping the car and arresting Salas. The officers were informed [by a reliable informant] that the house [which the car had just left] was a center of narcotics distribution. They knew that persons leaving the house approximately three hours earlier had been participants in a sizable *[sic]* narcotics transaction at exactly the time, place and manner stated by their informant, and that the Chevrolet which had left the house had been the means of conveying either to or from the Houston dealer a quantity of narcotics. They had seen appellant and the Ford come to the house twice in a matter of two hours, stay briefly and depart. They had seen a number of other vehicles follow the same pattern of coming to the house, the occupants entering and remaining briefly, and then departing . . . [T]he issue . . . is whether there is probable cause to believe that the Ford and its occupants, whatever their identity might be, were involved in the transportation of narcotics to or from a distribution point. The identity of the occupants is not a prerequisite to the existence of probable cause to believe that they were transporters.

This case is not governed by *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) where the apprehension of the defendant and the seizure from his person of narcotics were held invalid after he had been seen during an eight hours surveillance conversing on six or eight occasions with known narcotics addicts. The federal officers here were not centered upon narcotics users but upon a distribution point [which had been disclosed to them by a reliable informant]. They had observed numerous vehicle coming to the place and the occupants staying briefly and departing, and

at least one of the vehicles, occupied by persons from the house, had departed the house and engaged in transportation of narcotics to, or receipt from, the Houston dealer.

Thus *Salas* was a case where an informant had undisputably provided probable cause to search a house which his tip had established as a distribution center. Lengthy surveillance revealed a pattern of coming and going by persons *known to be purchasing drugs at the house.* Given this pattern there was probable cause to stop an unknown party which had followed the same pattern of coming to the house, the occupants entering and remaining briefly, and then departing. Here, by contrast, there was *nothing* known about the house, and surveillance had not been maintained long enough to observe *any* pattern of activity. Thus, if *Salas* was a "close case", here there was no case at all for a search of the house.

The other case relied on by the majority, *United States v. Melancon,* 462 F.2d 82 (5th Cir.), *cert. denied,* 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972), also offers little support for their analysis. The undercover agent in *Melancon* had purchased several unregistered firearms from one Kirsch, and was then told by Kirsch that a friend in Baton Rouge had additional weapons. After the agent expressed interest in purchasing these weapons, Kirsch telephoned his friend. The agent overheard Kirsch say "Is this the Ted Melancon who works for the phone company?" After talking on the phone Kirsch told the agent he was going over to the friend's to pick up some additional weapons. Kirsch left and subsequently returned with an unregistered weapon, which he sold to the agent. Further investigation revealed that there was a Ted Melancon who in fact did work for the phone company and also operated a gun shop. On the basis of this information, the *Melancon* court properly concluded that the agent had probable cause to get a warrant to search the home of Melancon. I fail to see how these facts lend any support to the proposition that a magistrate can issue a warrant to search a house which he only

knows is one of almost a dozen places where contraband may be hidden.

No case has been cited, and I have been unable to find any, in which an affidavit as fragile as this one has been held to provide probable cause. Indeed, courts have been reluctant to authorize the issuance of warrants to search a house when nothing is known about the premises or its occupants other than the fact that a person visited the house prior to committing a crime.[4] I therefore conclude that this case marks a disturbing departure from previous decisions which require more than mere suspicion to justify the search of a house.

### III

One other observation is necessary. The majority says that "the magistrate's determination of probable cause should be paid great deference on appeal." This is undoubtedly true when the issue is the credibility of the affiant. However, when the issue is *not* whether the information presented to the magistrate is believable but whether *if believed* the information is *sufficient*, a question of law is presented, and the magistrate's view of what the law requires certainly is not entitled to any unusual deference. This point is clear from the Supreme Court cases cited by the majority. In *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), for example, the Court said:

> We conclude therefore that hearsay may be the basis for a warrant. We cannot say that there was so little basis for accepting the hearsay here that the Commissioner acted improperly. The Commissioner need not have been con-

vinced of the presence of narcotics in the apartment. He might have found the affidavit insufficient and withheld his warrant. But there was substantial basis for him to conclude that narcotics were probably present in the apartment, and that is sufficient. It is not suggested that the Commissioner doubted Didone's word.

*Id.* at 271, 80 S.Ct. at 736.

Clearly the deference being paid to the commissioner in the passage above is deference to his decision to accept the hearsay information as credible and to believe Didone. There is no suggestion in the Court's analysis that deference should also be paid to commissioner's view of what legal conclusion should be drawn once he has decided what the facts are. Similarly, in *Spinelli* the Court mentioned that deference should be paid to the magistrate, but this deference did not prevent the Court from examining the facts alleged in the affidavit and finding that those facts—if believed—provided an inadequate basis on which to find probable cause.

Indeed, any other approach would ignore another basic principle: "It is fundamental that judicial review of [the magistrate's] determination must be strictly confined to the information which was brought to his attention." *United States v. Hill*, 500 F.2d 315, (5th Cir. 1974) (Clark, J.). *See also Aguilar v. Texas*, 378 U.S. 108, 109 n. 1, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *United States v. Ross*, 424 F.2d 1016 (4th Cir.), *cert. denied*, 400 U.S. 819, 91 S.Ct. 35, 27 L.Ed.2d 46 (1970); *United States v. Anderson*, 453 F.2d 174 (9th Cir. 1971); *Edmondson v. United States*, 402 F.2d 809 (10th Cir. 1968).

---

4. *See, e. g., United States v. McNally*, 473 F.2d 934 (3d Cir. 1973). In *McNally* there was probable cause to believe McNally was the "banker" for a gambling operation. The affidavit also revealed that over a period of a month McNally had been seen visiting a particular house and that frequently these visits would precede or follow his stopping at various bars where undercover agents had been placing bets. On his trips from the bars to the house he had been seen carrying a small paper bag, which is "a hallmark of the calling". On other occasions McNally's lieutenants in the gam-

bling operation had also been observed visiting the house with the "hallmark" paper bag after having made the rounds of the bars. This detailed pattern of activity continuing over a month and focused around the same house established probable cause to believe that the house was the "bank" (*i. e.*, record depository) of the gambling ring. Here by contrast, two hours of surveillance revealed that the house on Stratford Arms Drive was one of the places where two men (one a suspected drug dealer) stopped prior to *one* drug sale.

182

In this case the majority, out of "deference to the magistrate," has constructed hypotheses not supported by the affidavit to affirm his finding of probable cause. In my opinion they have adopted an approach to judicial review which, as a practical matter, renders a magistrate's finding of probable cause unassailable. I respectfully dissent.