555 F.2d 522
 UNITED STATES of America, Plaintiff-Appellee,
v.
Eugene R. SCOTT, Jean Brown, Robert Lee Hodges, Carl Goss,
Julian Lionel Scott, Luther Johnson, Virgil
Ogletree, Donald Moore, James Harding
and Lillian Harding,
Defendants-Appellants.
 No. 76-1438.
 United States Court of Appeals,
Fifth Circuit.
 July 11, 1977.
 
 Murray M. Silver, Atlanta, Ga. (Court-appointed) for E. Scott, J. Brown, R. Hodges, C. Goss, J. Scott, L. Johnson.
 
 
 1
 James R. Willis, Cleveland, Ohio, for V. Ogletree and D. Moore.
 
 
 2
 Edwin Marger, Nancy L. Finkel, Atlanta, Ga., for L. Harding and J. Harding.
 
 
 3
 John W. Stokes, U. S. Atty., Atlanta, Ga., Michael E. Moore, Atty. Appellate Section, T. George Gilinsky, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.
 
 
 4
 Appeals from the United States District Court for the Northern District of Georgia.
 
 
 5
 Before MORGAN and FAY, Circuit Judges, and HUNTER,* District Judge.
 
 EDWIN F. HUNTER, District Judge:
 
 6
 Appellants were convicted and sentenced on one count of violating the five-man gambling statute, 18 U.S.C. § 1955, and all but appellant Lillian Harding were convicted on one count of conspiracy to do so in violation of 18 U.S.C. § 371.[1]
 
 
 7
 The core of the Government's conspiracy theory involved a numbers lottery. In simplest terms this lottery consisted of persons picking a number and wagering that theirs would be the winning number. The daily winner was determined by a pre-arranged process and generally paid odds of five or six hundred to one. In the instant case the "hit," or winning number, was derived by taking the hundred-thousand and ten-thousand digits from the total bond sales on the New York Stock Exchange for that day as the first two figures and the ten-thousand digit from the total shares traded on the Big Board that day as the third. For example, if the total volume of bond sales on the New York Stock Exchange was $19,570,000 and the total shares traded was 16,250,000, the winning number for that day would be 575.
 
 
 8
 At street level, bets were placed with "writers" or "books" who would then pass the information either to "ribbon men" or directly to telephone relay operators. Four defendants, Julian "Q-Ball" Scott, Robert "Shipwreck" Hodges, Carl "Buster Mapp" Goss, and Luther "Buckhead" Johnson, were all named in the indictment as being writers or ribbon men."[2] These defendants would in turn pass the betting information to one of the telephone relay operators. The operators would record this information and compute the amount bet on each number. The operator's tally sheets and cassette tape recordings of phone calls received by them were then taken to the lottery "headquarters" by a "drag man." Eugene Scott worked in this capacity. Scott's duties consisted of making daily rounds to writers, ribbon men, and telephone relay operators, from whom he would pick up the lottery records for that day's wagering activities and deliver them to the lottery office prior to the closing bell of the New York Stock Exchange. Sometimes, he would also serve as a "collector" and would collect the money wagered less "hits" and the percentages due writers and ribbon men. The office was run by James Harding, a retired New York City police lieutenant, who was assisted by his wife, Lillian. It was there that records were kept of the "hits" and "totals" and also there that the amounts disbursed were controlled.
 
 
 9
 The upper echelon of the operation consisted of two "bankers" and their assistant or "troubleshooter" in Atlanta. The alleged bankers in this operation were Virgil Ogletree of Cleveland, Ohio, and Frank Moten of the New York City area. Donald "Ducky" Moore supervised the daily operations in Atlanta.
 
 
 10
 On appeal, defendants assert errors in the disposition of pre-trial motions, in the conduct of the trial, and in the substance of their convictions. Upon consideration of the numerous and overlapping assignment of errors, we find no reversible error and affirm.
 
 THE SUFFICIENCY OF THE AFFIDAVIT
 
 11
 On the afternoon of September 24, 1975, federal agents armed with warrants searched the residences of Donald Moore and James Harding. In the course of their search they discovered and seized a number of incriminating items, later introduced in evidence. The warrants authorizing these searches were issued on September 23, 1975 by U. S. District Judge Newell Edenfield[3] on the basis of a 49-page affidavit prepared by Special Agent Donald P. Burgess of the Federal Bureau of Investigation. Burgess' affidavit set forth information received from unnamed "informants" and "sources." It also contained Bureau investigation and telephone company records. Additional support for the issuance of the warrants was provided in the form of Agent Burgess' recitation of past experience:
 
 
 12
 Affiant (Burgess) has learned from his prior experience in investigating illegal numbers lotteries that the persons engaged therein customarily keep wagering paraphernalia, such as lottery slips, rundown sheets, ribbons, tapes, collection sheets, books of accounts, miscellaneous records of bets, code books, lists of telephone numbers, checks, money orders, and records of bank accounts in conducting such lotteries * * *. They also maintain safety deposit boxes with local banking concerns for the purpose of hiding lottery records, account ledgers and money. Normally, pass keys to such safety deposit boxes are kept by lottery participants on their person as well as in their headquarters, residences and vehicles. Based on all the information, facts, and circumstances set forth heretofore, Affiant has probable cause to believe that the foregoing described wagering paraphernalia and money is now being concealed on the premises, persons and in the automobiles previously described, and more particularly described in each of Affiant's individual Affidavits for Search Warrants, which are attached hereto.
 
 
 13
 Motions for the return of the seized evidence and for suppression were denied both prior to and during the trial. The thrust of these motions was that the affidavit was insufficient to support the issuance of the search warrant because (1) it did not establish the credibility of the information attributed to the unnamed "informants" and "sources", and (2) it did not set forth sufficient information independent of the data supplied by these "informants" and "sources" from which Judge Edenfield could reasonably have concluded that wagering paraphernalia was located at the Harding or Moore residences. Thus framed, appellants argue that the search warrants were invalid, in that the probable cause requirement of the Fourth Amendment was not met.[4] The mainstay of the Fourth Amendment's protection against unreasonable searches and seizures is the warrant requirement. What showing is constitutionally necessary to satisfy a magistrate that there is a substantial basis for crediting the report of informants, known to the police but not identified to the magistrate? United States v. Harris, 403 U.S. 573, 575, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). We are mindful of the admonition that a magistrate's determination of probable cause is entitled to great deference by reviewing courts. Jones v. United States, 362 U.S. 257, 270-71, 80 S.Ct. 725, 4 L.Ed.2d 697. The legal sufficiency is to be judged under the double test announced by the Supreme Court in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and subsequently in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1964). The magistrate must be informed of some of the underlying circumstances relied on by the person providing the information, as well as of some of the underlying circumstances from which the affiant concluded that the informant was credible or his information reliable. If the affidavit appears insufficient because either of these criteria has not been met, probable cause may still be established if the affidavit also recites corroborative evidence which buttresses either the informant's reliability or the reliability of his information. Spinelli, supra.
 
 
 14
 The affidavit here amply satisfied both criteria. The results of extensive independent investigation by the FBI established a "substantial basis" for crediting the information received. Moreover, in almost every instance specific information provided by one individual was corroborated by the fact that others contributed almost identical information. United States v. Harris, 403 U.S. 573, 580-581, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). This combination of informants' tips and FBI observations over an extended period of time is amply sufficient to warrant a man of reasonable caution to believe that an offense had been committed. United States v. Tucker, 526 F.2d 279, 281 (1976).
 
 
 15
 Appellants also attack the sufficiency of the affidavit by contending it did not reveal probable cause to believe that evidence of illegal gambling activity would be found in the Moore and Harding residences. The situation here does not differ markedly from other cases wherein this court and others, albeit without discussion, have upheld searches, although the nexus between the items to be seized and the place to be searched rested not on direct observation but on the normal inferences as to where the articles sought would be located. United States v. Lucarz, 430 F.2d 1051 (9th Cir., 1970). This court has recently addressed the problem:
 
 
 16
 While there is no firsthand evidence in the affidavit that materials subject to seizure were in the premises where the officers proposed to conduct their search, this is not always necessary. For instance, evidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence * * *.
 
 
 17
 The affidavit need not contain information providing certainty that the objects sought will be found as a result of the search. It is only necessary that "the facts and circumstances described in the affidavit would warrant a man of reasonable caution to believe that the articles sought were located" at the place where it was proposed to search. (citation omitted.) It is axiomatic that an affidavit for search warrant is to be interpreted in a common sense and realistic manner, and the magistrate's finding of probable cause should be sustained in doubtful or marginal cases. United States v. Maestas, 546 F.2d 1177, 1180 (5th Cir., 1977).
 
 
 18
 With the thoughts of the Maestas court in mind, the issue quickly narrows: Under the facts and circumstances described in the affidavit, would a man of reasonable caution believe that the articles sought were located at the place it was proposed to search? All of the sources and informants named Moore as the person in charge of the Atlanta numbers game during 1973 and 1974. The affidavit further recited that in the experience of affiant, persons engaged in illegal numbers lotteries usually kept lottery items in their headquarter residences and vehicles and specifically set forth information indicating that Moore was in fact transacting lottery-related business at home. Similarly, the affidavit established probable cause to believe that wagering paraphernalia could be found at the residence of James and Lillian Harding.
 
 
 19
 As appellants point out, the affidavit does not contain anyone's observation of the property at the respective residence; that missing information, however, is not fatal to a determination that probable cause existed to search the residence. Admittedly, there are other places where gambling paraphernalia might have been stored. Yet, we believe the facts and circumstances of this case gave the magistrate probable cause to believe the paraphernalia seized would be found.
 
 
 20
 We also reject Moore's argument that the information contained in the affidavit was too stale to establish probable cause, because much of it dealt with his activities during 1973. The issue of staleness of probable cause depends upon the nature of the unlawful activity alleged. Bastida v. Henderson, 487 F.2d 860, 864 (5th Cir., 1973); United States v. Harris, 482 F.2d 1115, 1119 (3rd Cir., 1973); United States v. Johnson, 461 F.2d 285, 287 (10th Cir., 1972). The affidavit here did not simply allege an isolated violation by Moore but rather revealed his current involvement in an established lottery which had been in continuous operation, and with which he had been intimately associated, since at least the early summer of 1973. Thus, the inclusion of information about Moore's activities during 1973 and early 1974 was necessary to give meaning to the data concerning his activities in the weeks and months immediately preceding submission of the affidavit.
 
 
 21
 Appellant Moore alleged, in support of a pretrial motion to suppress, that "the affidavit, upon which this warrant was based, contains material misstatements, factual inaccuracies, and other misinformation made therein for the purpose of over-persuading the Court to issue this search warrant." No effort was made to specify which portions of the affidavit were inaccurate. No allegation was made that defense counsel possessed any information which might substantiate any charge that affiant Burgess had wilfully or intentionally misled the judge. During a hearing to discuss pending pretrial motions, Moore offered nothing in support of his allegation, although the court specifically requested comments from counsel on the issue of whether a hearing was necessary to dispose of the motion to suppress. In his written order denying the motion to suppress, the court noted that Moore was not entitled to an evidentiary hearing as to the truth of the matters in the affidavit because Moore had "set forth nothing that would indicate the information in the affidavit is false."
 
 
 22
 The trial court's ruling was proper. Every Circuit that has considered the issue has agreed that a movant must, at the very least, make a preliminary showing that some allegation in the affidavit is false before he is entitled to a hearing for the purpose of impeaching the affidavit. United States v. Belculfine, 508 F.2d 58, 63 (1st Cir. 1974); United States v. Dunnings, 425 F.2d 836, 839, 840 (2nd Cir. 1969), cert. den. 397 U.S. 1002, 90 S.Ct. 1149, 25 L.Ed.2d 412; United States v. Luna, 525 F.2d 4, 8 (6th Cir., 1974); cert. den. 424 U.S. 965, 96 S.Ct. 1459, 47 L.Ed.2d 732, 1976; United States v. Carmichael, 489 F.2d 983, 988 (7th Cir., 1973); United States v. Rael, 467 F.2d 333, 336 (10th Cir., 1972), cert. den. 410 U.S. 956, 93 S.Ct. 1429. See also United States v. Armocida, 515 F.2d 29, 40-42 (3rd Cir., 1975); cert. den. 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84; United States v. Marihart, 492 F.2d 897, 899 (8th Cir., 1974), cert. den. 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51.
 
 
 23
 DISCLOSURE OF IDENTITY OF CONFIDENTIAL INFORMANTS
 
 
 24
 Appellants utilize two arguments in support of their contention that the informers' identities were necessary to the preparation of their defense. First, it is argued that under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) the evidence was potentially exculpatory. Brady does not permit a defense fishing expedition whenever it is conceivable that evidence beneficial to defendants may be discovered. Rather, it deals with prosecutorial misconduct in the form of withholding information which itself is material to exculpating the defendant or impeaching government witness. United States v. Davis, 487 F.2d 1249 (5th Cir., 1973). There has been no such showing here.
 
 
 25
 Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), governs requests for identification of confidential informers. There, the Court stated:"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstance of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U.S. at 60, 61-62, 77 S.Ct. at 629.
 
 
 26
 Unlike the situation in Roviaro "where the Government's informer was the sole participant, other than the accused," the case against these appellants did not turn upon proof of an isolated transaction. The evidence presented to the jury concerning the series of events which revealed appellants' participation did not in any way allude to the existence of any unidentified source. The government's case did not rely in any measure upon secondhand accounts of lottery-related transactions between appellants and any of the sources. Having thus failed to demonstrate any need to know the identities of these sources sufficient to outweigh the government's interest in preserving their anonymity, appellants were not entitled to disclosure. United States v. Freund, 525 F.2d 873 (5th Cir., 1976); United States v. Doe, 525 F.2d 878 (5th Cir., 1976).
 
 
 27
 THE PRIOR STATEMENTS OF UNINDICTED CO-CONSPIRATORS
 
 
 28
 Both prior to and during the course of the trial, appellants requested the judge to order the government to produce the grand jury testimony and any statements of unindicted co-conspirators. These individuals were not called as witnesses. However, near the conclusion of the trial, the government tendered the requested grand jury transcripts and FBI interview summaries to the court for in camera inspection. After its examination of these materials the court remarked "in sum and total there is nothing here helpful to the defense." Nevertheless, in an effort to insure that appellants had the benefit of any materials which could conceivably aid them in their defense, the district judge instructed government counsel to give to defense counsel the material relating to Jones, Brown and Hailes.
 
 
 29
 Appellants Moore, Ogletree and the Hardings contend that the trial court's production order came too late to permit them to assess adequately the value of these materials. We find nothing in the record to indicate that an earlier disclosure would have been helpful.[5]
 
 SINGLE OR MULTIPLE CONSPIRACIES
 
 30
 All appellants assert that a variance existed between the indictment charging a single conspiracy involving multiple defendants and the proof which, at best, they claim revealed plural conspiracies involving multiple parties. As a result, appellants argue, the probability that their individual conviction was the result of the transference of guilt to him (or her) from members of a conspiracy with which they had no connection. U. S. v. Bertolotti, 529 F.2d 149 (2nd Cir., 1975). Appellants rely primarily on the fact that some of the people who worked in the lottery in 1973 were no longer active during the final months of its operation. Specifically, they argue that Mary Stewart and James Harding, who managed the lottery office during the summer of 1974, were not employed by the lottery at its inception in 1973 and were thus not acquainted with Betty Lyles, Julius Lyles, Ruby Hammons and Jerry Pierce. Julius Lyles' testimony that he continued to turn over his "book" to the "Ducky" Moore operation, even after he and his wife had been fired by Moore, is probative of the fact that the lottery remained in continuous operation between the departure of the Hammons, Pierce and the Lyles, and the arrival of the Hardings. The dismissal of one group of employees and the recruitment of another group did not mark the beginning of a new conspiracy, but simply reflected internal personnel changes within a single, on-going enterprise financed by Ogletree, supervised by Moore, and served in various capacities by Eugene Scott, John Allen, Robert Hodges and Jean Brown.
 
 
 31
 The record reflects careful planning and cooperation on the part of the persons involved. It would be a perversion of natural thought to call such continuous cooperation a cinematographic series of distinct conspiracies rather than to call it a single one. United States v. Perez, 489 F.2d 51, 63 (5th Cir., 1973). In any event, under the circumstances presented, with overlapping membership and activities all directed toward a common goal, most courts have found, as we do here, sufficient evidence to uphold the jury verdict reflecting a single conspiracy. United States v. Perez, supra; United States v. Cruz,[6] 478 F.2d 408 (5th Cir., 1973); United States v. Lloyd, 425 F.2d 711 (5th Cir., 1970); United States v. Nasse, 432 F.2d 1293 (7th Cir., 1970); United States v. Borelli, 336 F.2d 376 (2nd Cir., 1964); United States v. Morado, 454 F.2d 167 (5th Cir., 1972).
 
 SEVERANCES
 
 32
 In contentions closely related to those alleging prejudicial variance between the indictment and the proof, appellants Brown, Hodges, Goss, Johnson, Eugene Scott and Julius Scott argue that their initial joinder in the same indictment and subsequent joinder for trial were improper. They contend that even if one conspiracy was shown as we have held, and joinder was therefore proper under F.R.Crim.P. 8, the complexity of the evidence rendered denial of their motions for severance under F.R.Crim.P. 14 an abuse of discretion. To obtain a severance under Rule 14 the movants have the burden of convincing the court that without such relief they will be unable to obtain a fair trial. United States v. Perez, supra. In Blumenthal, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the Supreme Court, in responding to contentions on appeal that the safeguards implemented by the trial court were inadequate to preclude compelling prejudice, listed three safeguards which must be accorded in a mass trial: (1) clear rulings on admissibility; (2) limitations of the hearing of evidence as against particular individuals and (3) adequate instructions. Each safeguard was accorded, and in view of the trial court's caution, the risk of transference of guilt over the border of admissibility was reduced to the minimum.
 
 
 33
 It is further asserted by some appellants that the trial court abused its discretion by denying their motion for severance which was made following the testimony of co-defendant James Harding. The focus of this argument was Harding's claim that a few days following his arrest a government agent offered him $1,000 to implicate Ogletree and Moten in the Atlanta numbers lottery. Precisely, Harding stated that FBI Agent Paul King took him to a safety deposit box where Harding kept some gambling proceeds and proposed to Harding that "if I would be cooperative with him that I could have some of the money." Harding stated that he was then allowed to take $1,000 from the safety deposit box. Harding did not mention any of the other appellants in his testimony. He did state, of course, that he was asked to cooperate to "get Ogletree and Moten" and that he refused because Ogletree and Moten were not involved. As the trial court noted in denying the motion for severance, the likely impact of Harding's testimony, if believed, was to cast doubt on the good faith of the government's prosecution rather than to prejudice these appellants.
 
 
 34
 We further reject the contention that the conduct of the other defense counsel were not conducive to a fair trial. That certain defendants might have had a better chance of acquittal if tried separately does not establish their right to a severance under Rule 14. United States v. Clark, 480 F.2d 1249 (5th Cir., 1973).
 
 SUFFICIENCY OF THE EVIDENCE
 
 35
 Appellants Moore, Ogletree, Julius Scott and Lillian Harding insist that the evidence against each of them was insufficient to prove their participation in the lottery operation.
 
 
 36
 We must view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Leslie, 542 F.2d 285 (5th Cir., 1976); United States v. Rojas, 537 F.2d 216 (1976). The test for sufficiency is whether reasonable jurors could find the evidence inconsistent with every hypothesis of innocence. United States v. Rojas, supra. Under these standards we hold that in every practical sense the facts reveal a single conspiracy and that each of the appellants was an integral part of that conspiracy. The guilt of each has been proved beyond a reasonable doubt.
 
 
 37
 (1) Donald Moore The evidence against Moore was overwhelming. He recruited Julius Lyles to join the lottery in 1973 and supervised Lyles' collection activities. He directly supervised the operation of the lottery office during Hammons' tenure. FBI surveillance established his continued association during 1974 with other individuals whose involvement at that time is undisputed. A large volume of lottery paraphernalia bearing the fingerprints of those in charge of the lottery office during 1974 was seized from Moore's residence by FBI agents.
 
 
 38
 Ogletree His role is substantially shown by his numerous trips to Atlanta during which he associated almost exclusively with participants in the lottery. He was with Frank Moten on July 21, 1974 when Moten drove Mary Stewart to LaGuardia Airport so that she could travel to Atlanta to join the lottery. At the time of his arrest Ogletree made the statement that he was a "professional gambler." This evidence established the necessary predicate of a prima facie showing of Ogletree's participation in the conspiracy. United States v. James, 510 F.2d 546 at 549 (5th Cir., 1975). This was sufficient to permit the jury to consider the hearsay declaration of co-conspirator Donald Moore to Jerry Pierce that his partner in the lottery was "Virgil," and a similar declaration by co-conspirator Eugene Scott to Mary Stewart to the effect that Scott was going to ask "Virgil" for a raise in pay.[7] These declarations clearly tied Ogletree to the lottery operation and made it clear that his periodic trips to Atlanta to meet with the lottery's operators were for the purpose of supervising and checking on the operation. Surely, the jury was entitled to draw reasonable inferences from coincidental appearances and statements as regular as his.
 
 
 39
 (3) Lillian Harding She argues that she was an innocent bystander to her husband's involvement in the lottery. Mary Stewart testified that Lillian Harding drove her to pick up the daily lottery slips from Eugene Scott during certain periods of the conspiracy. FBI surveillance agents observed Mrs. Harding on several occasions carrying out lottery-related duties.
 
 
 40
 (4) Julian Scott The evidence of Scott's involvement is clear and unambiguous. Scott was known in the Atlanta community by the distinctive name of "Q Ball." Many of the gambling records seized from the various apartments on September 24, 1974 bore the designation "Q Ball" or "Q B." An FBI lottery expert concluded, based upon his examination of those records, that "Q B" served as at least a bet writer for the Atlanta organization. This and other coincidental appearances was sufficient so that the jury could find his participation inconsistent with every other hypothesis of innocence beyond a reasonable doubt.
 
 THE GOVERNMENT'S PEREMPTORY CHALLENGES
 
 41
 The subject of peremptory challenges was first discussed on November 3rd during a conference of court and counsel. At that time the court tentatively ruled that the defendants would collectively be accorded ten peremptory challenges, and the government six.[8] Subsequently, on November 4, 1975, Mr. Silver, one of the defense counsel, moved for peremptory challenges in excess of the number provided in Rule 24 of the Federal Rules of Criminal Procedure. Specifically, he requested that the defense be given two additional challenges. The motion was taken under advisement and after completing the examination of prospective jurors, the following is recorded in the trial transcript:
 
 
 42
 (Conference at bench):
 
 
 43
 THE COURT: I am now going to take about a ten minute recess so you can consult your notes and be ready then to move.
 
 
 44
 Now, I think I can give seven (peremptory, challenges) to the government, twelve to the defense; and I hope by taking this little recess that you can move reasonably swiftly in selecting your strikes.
 
 
 45
 MR. SLOTNICK: (Counsel for James and Lillian Harding) We would object to the government having an additional peremptory. I don't think they need it, there are so many of us and just one of them.
 
 
 46
 THE COURT: We have it on the record, but I will give them seven and you twelve.
 
 
 47
 MR. SLOTNICK: Thank you.
 
 
 48
 (Court recessed for ten minutes.)
 
 AFTER RECESS
 
 49
 THE COURT: Let me see counsel for the government just a moment, and, of course counsel for the defendants are invited. I just want to pass along something Mr. Silver called to my attention.
 
 
 50
 (Conference at bench.)[9]
 
 
 51
 THE COURT: All right, Mr. Evans, you may call to the attention of counsel the procedure for the selection of the jury, and there will be the number of strikes that I announced in the side bar conference we had just before the break.
 
 
 52
 MR. SLOTNICK: Over our objection, Your Honor.THE COURT: I understand.
 
 
 53
 Our research reveals five cases concerning the discretion of a federal district court to allow the government expanded peremptory challenges. Kloss v. United States, 77 F.2d 462 (8th Cir., 1935), involved a misdemeanor. Statutorily, the government was entitled to three challenges. The district court permitted five. The Eighth Circuit concluded that defendant did not properly raise the objection and that a party's right to reject or object to the selection of jurors ends when a fair and impartial panel has been chosen. In New England Enterprises, Inc. v. United States, 400 F.2d 58 (1st Cir., 1968), cert. den. 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 the First Circuit declined to consider whether it was error under Rule 24(b) to employ a jury selection procedure which permitted both defense and prosecution to exercise unlimited peremptory exceptions. It was noted that defense counsel's general objections to the procedure did not specifically apprise the trial court as to the precise issue. In United States v. Projansky, 465 F.2d 123 (2nd Cir., 1972), cert. den. 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 the trial court granted defendants 16 challenges and the government eight. Defense counsel categorically entered a formal objection to the allowance of the two extra challenges. The Court of Appeals declared that the trial judge was not made aware of Rule 24(b) and that because of this, and
 
 
 54
 "in the absence of a showing of prejudice, the claimed error does not affect 'substantial rights.' "
 
 
 55
 In United States v. Potts, 420 F.2d 964 (4th Cir., 1970), cert. den. 398 U.S. 941, 90 S.Ct. 1855, 26 L.Ed.2d 276, appellants urged that the trial judge erroneously allowed two additional challenges to each side. Eight were permitted to the prosecution, and 12 to the government. The court stated:
 
 
 56
 "No doubt of the impartiality of the jurors who tried the case is even intimated. Moreover, the procedure was agreed upon by counsel as an acceptable method of choosing a jury. We perceive no possible injury to the appellant or other error in this procedure."
 
 
 57
 In United States v. Tucker, 526 F.2d 279 (5th Cir., 1976), the trial judge initially granted additional peremptories to both prosecution and defense, but withdrew all additional challenges when defense counsel argued that there was no authority to grant additional peremptories to the government. This court noted:
 
 
 58
 "Their argument is based on the inferences from the last sentence of Fed.R.Crim.P. 24(b), which provides: 'If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly.' "
 
 
 59
 "Assuming arguendo that defense counsel were correct in this argument, it is nonetheless permissible for the parties to stipulate for additional peremptories by both sides."
 
 
 60
 In considering the question of an excess peremptory challenge granted to the government, we find no decision that holds this to be plain error. The lack of precedent is of little weight, because plain error must be determined on a case by case basis. In our view reversal is mandated only if a defendant's right to exercise peremptory challenges is abridged, or if his right to a fair and impartial jury has been endangered. In this case, the additional peremptory challenges did not in any way abridge these appellants' right to exercise their own challenges. Moreover, the allocation of strikes 12 for the defense and 7 for the prosecution preserved the proportional advantage held by the defense and actually increased from four to five the numerical superiority in peremptories normally enjoyed by the defense under the rule. There is no evidence that the jury as finally selected was other than representative and impartial. The claimed error does not affect substantial rights and did not constitute reversible error.[10]CONCLUSION
 
 
 61
 All other claims of error have been considered and are rejected. We affirm the judgment of the trial court as respects all appellants on each count under which convicted.
 
 
 
 *
 Senior District Judge of the Western District of Louisiana, sitting by designation
 
 
 [1]
 The district judge granted a motion on behalf of Frank Moten for severance due to his health. Robert Lee McGhee was acquitted. The remaining ten defendants were found guilty of the substantive gambling charge, and all except Lillian Harding were convicted of conspiracy. The penalties imposed ranged from Lillian Harding's three-year sentence on the substantive Section 1955 violation, which was suspended in favor of three years' probation, to Virgil Ogletree's concurrent five year prison terms and cumulative $10,000 fines on each of Counts I and II
 
 
 [2]
 Nicknames are often used in recording gambling information. For example, a significant portion of the evidence against Julian "Q Ball" Scott dealt with the fact that "Q Ball" or "Q B" was found on lottery records to indicate a writer or ribbon man
 
 
 [3]
 While Judge Edenfield approved issuance of the warrants, he did not preside at the trial
 
 
 [4]
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. Amendment IV, United States Constitution
 
 
 [5]
 These appellants apparently contend that the materials are exculpatory on the theory that they showed that the three unindicted co-conspirators were merely "players," or bettors, and therefore could not be counted for purposes of determining whether the Atlanta lottery involved the statutorily-required number of participants. The government did not introduce any evidence at trial to show that these individuals were members of the organization, and thus the jury could not have counted them in reaching its verdict
 
 
 [6]
 Appellants also contend that the trial court erroneously instructed the jury on the issue of multiple conspiracies. Although in our view the evidence revealed a single conspiracy, the trial court, out of an abundance of caution, submitted the issue to the jury, as it was entitled to do. United States v. Vicars, 467 F.2d 452, 454 (5th Cir., 1972). This charge correctly stated the law as enunciated in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 557 (1946)
 
 
 [7]
 Appellant Ogletree devotes several pages of his brief to a claim that the admission of this testimony concerning the declarations of co-conspirators violated his right of confrontation. The hearsay rule does not automatically bar all out-of-court statements by a defendant in a criminal case. Declarations by one defendant may be admissible against other defendants upon a sufficient showing by independent evidence, which existed here, of a conspiracy among one or more other defendants and the declarant, and if the declarations at issue were in furtherance of that conspiracy. United States v. Nixon, 418 U.S. 683 at 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Ogletree particularly objects to a portion of Julius Lyles' testimony regarding Moore's statement that he would have to check with "Virge." That portion of Lyles' testimony passed without objection. In any event, the remark clearly evidenced Lyles' status as an employee of the lottery operation and was accordingly relevant to the existence of the conspiracy
 
 
 [8]
 Rule 24. Trial Jurors
 (b) Peremptory Challenges. If the offense charged is punishable by death, each side is entitled to 20 peremptory challenges. If the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges. If the offense charged is punishable by imprisonment for not more than one year or by fine or both, each side is entitled to 3 peremptory challenges. If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly.
 
 
 [9]
 This conference was not recorded, but Mr. Silver in his supplemental brief, notes that during the recess he obtained a copy of the United States Code Service and read to the judge the pertinent code section and cited at least one case wherein it was held that the government could not have the extra challenge
 
 
 [10]
 We note that this problem is unlikely to be a recurring one. The proposed new rule governing the allocation of peremptory challenges vests the trial court with discretion to grant additional peremptory challenges to either the defense or the prosecution. See proposed Rule 24(b)(2)(A) in Communication from the Chief Justice of the United States, H.R. Doc. No. 464, 94th Cong., 2d Sess. 13. The new version of Rule 24(b) is currently scheduled to become law on August 1, 1977. Act of July 8, 1976, Pub.L.No. 94-349, § 1, 90 Stat. 822