UNITED STATES of America, Plaintiff,

v.

Otis L. WEST, Defendant.

UNITED STATES of America, Plaintiff,

v.

Adolphus S. HALL, Jr., Defendant.

Crim. A. Nos. 80–62, 80–1.

United States District Court,
D. Delaware.

March 4, 1981.

James W. Garvin, Jr., U. S. Atty. and Theopalis K. Gregory, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

John Gandolfo, Jr., Wilmington, Del., for defendant Otis L. West.

Alene S. Berkowitz of Knecht, Greenstein, Schagrin & Berkowitz, Wilmington, Del., for defendant Adolphus S. Hall, Jr.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

Defendants, Otis L. West and Adolphus S. Hall, Jr., are charged in separate indictments with unlawful possession of a firearm which was not registered and not identified by serial number, in violation of 26 U.S.C. § 5861(d) and (i). In addition, defendant West is charged with possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1) and defendant Hall is charged with aiding and abetting the same. Packets of heroin, which are commonly referred to as "New York Quarters," and the gun were seized by officers of the Chester, Pennsylvania Police Department and special agents of the federal Drug Enforcement Administration ("DEA"), on December 11, 1980, during the course of a search of defendant Hall's apartment conducted pursuant to a search warrant issued by United States Magistrate N. Richard Powers on December 9, 1980. In addition, other heroin packets were seized from the person of defendant West after he was arrested without a warrant on December 11, 1980. Both defendants separately have moved to suppress the gun and the packets of heroin seized from Hall's apartment on the ground that the affidavit upon which

the search warrant was granted was insufficient to support a finding of probable cause. In addition, defendant West argues that the search warrant was facially overbroad and thus illegal, and that the police lacked probable cause to arrest him. Accordingly, West further seeks to suppress all evidence seized from, and all statements made by, him in conjunction with the warrantless arrest.[1] An evidentiary hearing was held on defendant West's motion on January 30, 1981, West's counsel and the government both submitted briefs on the issues presented therein and oral argument was heard by the Court on February 20, 1981.[2]

### I. The Search Warrant

#### A. Standing

As a preliminary matter, the Court must determine whether Otis West has standing to challenge the warrant issued to search Hall's apartment.[3] Until recently, under the holding of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), a defendant charged with a crime of possession was vested with "automatic standing" to challenge the legality of the search which produced the evidence against him. In a case decided last term, however, the Supreme Court decided that the automatic standing principle had "outlived its usefulness" and abandoned the rule in favor of a more conventionally crafted rule of thumb which requires the defendant to establish that he had a legitimate expectation of privacy in the premises searched. *See United States v. Salvucci*, 448 U.S. 83, 95

1. Defendant Hall was arrested pursuant to a warrant and has raised no other independent objections to the circumstances giving rise to his arrest beyond questioning the validity of the December 9, 1980 search warrant issued by Magistrate Powers.

2. Defendant Hall also requested an evidentiary hearing on his motion to suppress evidence which was set by the Court for February 20, 1981. At the time designated for that hearing, however, Hall's counsel appeared before the Court and stated that she had failed to subpoena the requisite witnesses to testify and could

present no evidence in support of her client's motion. Hall's counsel agreed, nonetheless, that the validity of the search warrant would be determined solely by the facts contained within the affidavit itself, and that, accordingly, the Court's ruling on West's motion to suppress would be dispositive of the issues raised by Hall's motion.

3. The government does not dispute the fact that Adolphus Hall, as the legal occupant of the apartment, has standing to challenge the search in question.

100 S.Ct. 2547, 2554, 65 L.Ed.2d 619 (1980). *See also Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Accordingly, in order to challenge the propriety of the search warrant, West must demonstrate that he possessed the requisite legitimate expectation of privacy in Hall's apartment.

The evidence adduced by West on this issue in the suppression hearing was conflicting. It is undisputed that West had a key to Hall's apartment. The police officers and DEA agents testified at the suppression hearing that they took West's key from his person after he was arrested on December 11, 1980 outside of Hall's apartment and used this key to enter the apartment. Furthermore, West testified at the hearing that he had complete access to the apartment, that he slept there on occasion, and that he had made cash payments to Hall toward the rent. In addition, intermittent surveillance of the apartment by Agent Glanz and officers of the Chester Police Department, during the period from November 21 to December 11, 1980, revealed that one or more of three cars operated by West was normally parked outside of Hall's apartment, and on at least six occasions, one of West's cars was observed arriving at or leaving the apartment. In contrast, Hall's name alone appears on the rental application for the apartment and both at the time of his arrest and on cross-examination at the suppression hearing, West admitted that he actually resided in Chester, Pennsylvania at the home of his parents. Moreover, none of West's cars was registered to him at Hall's address.

Although the evidence is less than conclusive, the Court will assume for the purpose of the present motion, that West had a legitimate expectation of privacy in Hall's apartment. *See United States v. Portillo,* 633 F.2d 1313, 1317 (C.A.9, 1980); *United States v. Ochs,* 595 F.2d 1247, 1253 (C.A.2), *cert. denied,* 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

**B.** *Probable Cause*

In general, the legality of a search warrant will be determined by reference to the information contained within the four corners of the underlying affidavit. *United States v. Martinez,* 588 F.2d 1227, 1234 (C.A.9, 1978); *United States v. Damitz,* 495 F.2d 50, 54 (C.A.9, 1974). An affidavit is sufficient to support the warrant if it adequately demonstrates probable cause, that is, "if the facts alleged therein would allow a person of reasonable caution to believe that the evidence sought will be found in the stated place." *United States v. Martinez, supra,* 588 F.2d at 1234. Despite the volumes of judicial prose devoted to clarifying this definition, the concept of probable cause has proved too elusive to quantify in exact terms. *See United States v. Chester,* 537 F.2d 173, 175 (C.A.5, 1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1120, 51 L.Ed.2d 548 (1977). Accordingly, in each case, the reviewing court must make an ad hoc determination of the propriety of issuing the warrant based on all the available facts contained in the affidavit.

Some presumptions have emerged, however, with which a reviewing court must approach a probable cause examination. *United States v. McNally,* 473 F.2d 934, 937 (C.A.3, 1973). First, only the probability, and not a prima facie showing, of criminal conduct is necessary to support the issuance of the warrant. *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969); *United States v. McNally, supra,* 473 F.2d at 937; *United States v. Trott,* 421 F.Supp. 550, 553 (D.Del.1976). Although the allegations of an affidavit must go beyond mere suspicion, they need not constitute clear evidence which would justify conviction. *Brineger v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *United States v. Martinez, supra,* 588 F.2d at 1234; *United States v. Scott,* 555 F.2d 522, 527 (C.A.5), *cert. denied sub nom. Ogletree v. United States,* 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478 (1977); *United States ex rel. Hurley v. State of Delaware,* 365 F.Supp. 282, 285 (D.Del.1973). Second, affidavits of

probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial. *Spinelli v. United States, supra,* 393 U.S. at 419, 89 S.Ct. at 590. Thus, for example, hearsay properly may form the factual basis for issuing a warrant. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Third, the affidavit is to be interpreted in a common sense and realistic manner without recourse to hypertechnical limitations. *United States v. Ventresca,* 380 U.S. 102, 108–109, 85 S.Ct. 741, 745–746, 13 L.Ed.2d 684 (1965); *United States v. Scott, supra,* 555 F.2d at 527; *United States v. Donlon,* 334 F.Supp. 1272, 1275 (D.Del.1971). And finally, reviewing courts should pay great deference to a determination by a magistrate that probable cause did exist to issue the warrant. *Spinelli v. United States, supra,* 393 U.S. at 419, 89 S.Ct. at 590; *Jones v. United States, supra,* 362 U.S. at 270–71, 80 S.Ct. at 735–36; *United States v. Chester, supra,* 537 F.2d at 175. In borderline cases, preference should be accorded to upholding the validity of the warrant. *United States v. Martinez, supra,* 588 F.2d at 1234.

With these principles in mind, the Court now turns to an examination of the search warrant issued in this case. The affidavit submitted in support of the search warrant was prepared by William Glanz, Special Agent of the DEA and a federal narcotics agent since 1969, and Sergeant Albert Chess, a 13 year veteran of the Chester Police Department and currently head of the Drug Unit. The relevant facts contained in the affidavit fall naturally into three distinct categories. The first six pages contain general information concerning the Chester Police Department investigation underlying the search warrant, the principals which were the subject of that investigation, and a description of the premises to be searched. The second group of pages details information provided to the Chester Police Department by three undisclosed informants, while the third and final section contains a log of observations recorded by Agent Glanz during intermittent surveillance of Hall's apartment conducted from November 21 to December 8, 1980. The information contained within these three sections may be summarized as follows: Sergeant Chess and other officers of the Drug Unit of the Chester Police Department have conducted an investigation of a purported heroin distribution organization headed by Otis West since at least 1978. The affidavit avers that this investigation has demonstrated that West controls most of the heroin sold in Chester, Pennsylvania, that his second in command is Gregory Johnson, a. k. a. "Slick Rick," and that his dealers are Larry Hudnell, a. k. a. "Cheeks," William Easton, a. k. a. "Bobby," and Michael Bell. Both West and Easton have been convicted of violating Pennsylvania state drug laws within the last two years, and both are awaiting sentence on convictions of narcotics trafficking and conspiracy in federal district court in the Eastern District of Pennsylvania. Hudnell similarly was recently convicted of selling heroin in the same federal district court and currently is awaiting the results of an appeal taken from that conviction.

The affidavit further states that "numerous informants" have told Sergeant Chess and his subordinates that West obtains about 400 or more packets of heroin in the form of "New York Quarters" from New York on a weekly basis. These New York Quarters purportedly cost about $40.00 to $50.00 each wholesale in New York and sell for about $75.00 to $90.00 retail in Chester. During the investigation that led to West's conviction in the Eastern District of Pennsylvania, West met with an undercover Philadelphia police officer named Al Williams on January 24, 1980, and offered to sell the officer two ounces of high grade heroin for $20,000. West advised the officer at that meeting that he obtained his heroin from Italian traffickers in New York City. The sale was not consummated, however, because West later became suspicious of the officer.

According to the affidavit, West uses at least three automobiles: a 1978 beige Dodge Van, a gray 1976 Lincoln Continen-

tal, and a black 1977 Cadillac.[4] The first two cars are registered to West's mother, while the cadillac is registered to West at 312 West 20th Street, Wilmington, Delaware. Johnson allegedly drives a 1975 red corvette which is registered to Adolphus Hall. The affidavit states that officers of the Chester Police Drug Unit have seen this car "on hundred of occasions being driven by Johnson but not one time being driven by Hall." Finally, Larry Hudnell purportedly operates a green 1977 cadillac which is registered to Horace Hudnell, believed to be Larry Hudnell's brother or father. Hudnell allegedly used this same car while distributing heroin in Pennsylvania, the activity for which he was later convicted in federal court. After his arrest, the car was seized and Hudnell told a Special Agent of the DEA that the car was registered to his stepfather, but was used exclusively by him.

The object of the search warrant was Hall's apartment at 281 Harbor Drive, # 10, Claymont, Delaware. Agent Glanz reviewed Hall's rental application on November 24, 1980 and ascertained that Hall had rented the apartment in March, 1980. Hall's previous residence was at 722 Peachtree Road, Claymont, Delaware, from which he allegedly was evicted sometime in early 1980. The rental records further indicated that Hall operates a 1976 Cadillac Seville.

In early 1980, an undisclosed informant ("informant # 1") told Sergeant Chess and Officer Wendall Butler of the Drug Unit that he had been to Adolphus Hall's Peachtree Road apartment within the preceding week. When informant # 1 and Hall left the apartment, Hall carried a brown bag containing numerous New York Quarters of heroin which Hall stated he was going to deliver to Gregory Johnson for sale in Chester. In late August 1980, a second undisclosed informant ("informant # 2") told Sergeant Chess and Officer John Gretsky of the Drug Unit that during the summer of 1980, the informant had been with William Easton on numerous occasions when Easton

had picked up large quantities of heroin in the form of New York Quarters from Johnson. The deliveries purportedly were made by Johnson, in the red corvette registered to Adolphus Hall, in parking lots located in northern Delaware. Easton further told the informant that the heroin was stashed in an apartment complex in northern Delaware.

On November 21, 1980, officers of the Chester Police Department requested Agent Glanz of the DEA to initiate a surveillance on Adolphus Hall's apartment at 281 Harbor Drive, Claymont, Delaware. From the commencement of the surveillance period through December 8, 1980, in spot checks of the apartment, Agent Glanz recorded observations which in pertinent part may be summarized as follows: (1) one or more of West's three cars was normally parked outside the apartment; (2) on at least two occasions West was sighted entering or leaving the apartment building and on at least three other occasions, one of West's cars was sighted parking at, or leaving, the vicinity of the building; (3) Johnson's red corvette was parked near the building at least once and Johnson himself was observed leaving the building and driving away in West's van on one occasion; (4) Hall's car was observed on at least five occasions parked outside the apartment building; and (5) late on the evening of December 8, 1980, Hall's Seville left the apartment and was followed to East 35th Street, Wilmington, where it stopped at the curb for 30 seconds, circled the block and then returned to the apartment.

On December 5, 1980, at approximately 3:20 in the afternoon, West was observed arriving at Hall's apartment building at 281 Harbor Drive in his van. Eight minutes after he entered the building, West reemerged and was followed to a Rest Stop on Route 95 just north of the Pennsylvania state line where he parked and remained in his van. One minute later, the green 1977 cadillac driven by Larry Hudnell, a. k. a.

---

4. The automobiles mentioned in the affidavit were in almost all instances identified by

license plate number as well as by description.

"Cheeks," arrived at the Rest Stop and parked next to West's van. A black male got out of the green cadillac and entered the van where he remained for approximately one minute. The man then returned to his cadillac and headed north on Route 95. At that point, West also departed the Rest Stop and drove north on Route 95.

One day following this incident, an undisclosed informant ("informant # 3") advised Officer Gretsky that on Friday, December 5, 1980, informant # 3 had been in the company of a drug dealer in Chester named Steven Dale at about 4:00 p. m. Dale told informant # 3 that he was almost out of heroin and that he was expecting a shipment from "Cheeks" in the near future.

Defendant West principally argues that this affidavit is insufficient to support a finding of probable cause for the following reasons: (1) the preliminary information relating to the two year investigation by the Chester Police Department is conclusory and unsupported by any factual predicate and must be disregarded; (2) the information provided by the three undisclosed informants is unreliable under the standards enunciated by the Supreme Court in *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); (3) the affidavit is devoid of observations by either police officers or informants that heroin was taken into Hall's apartment, or that purchases of heroin were made on the premises; and (4) most of the information contained within the affidavit is stale and must be rejected.

█ The Court has carefully considered defendant's objections and finds that, judged by the general principles referred to earlier in this opinion, the validity of the search warrant must be sustained. Although none of the factual allegations contained within the affidavit, standing alone, would be sufficient to establish probable cause, the general information gleaned as a result of the two year investigation of West, the informants' reports, and the surveillance log, considered in tandem, provide a sufficient basis for a finding of probable cause and for the issuance of the challenged search warrant. *See United States v. Main,* 312 F.Supp. 736, 738 (D.Del.1970).

█ Clearly, the information provided by the three informants properly may be considered by this Court in evaluating the sufficiency of the affidavit. Under the two-pronged test announced by the Supreme Court in *Aguilar* and *Spinelli,* in order to credit the averments of an undisclosed informant contained in an affidavit, the magistrate must be informed of some of the underlying circumstances relied on by the person providing the information, as well as some of the facts from which the affiant concluded that the informant was credible or his information reliable. *Aguilar v. Texas, supra,* 378 U.S. at 109, 84 S.Ct. at 1511; *Spinelli v. United States, supra,* 393 U.S. at 413, 89 S.Ct. at 587. The affidavit submitted to Magistrate Powers amply satisfies both criteria for each of the three informants.

Informant # 2 reported information which he had directly observed, i. e., he had been with Easton on numerous occasions when Easton picked up heroin in the form of New York Quarters from Johnson. The informant further stated that these deliveries were made by Johnson in a red corvette in parking lots in northern Delaware, a fact which is partially corroborated by police information establishing that Johnson drove a red corvette registered to Adolphus Hall. These firsthand observations are sufficiently detailed to satisfy the first prong of the *Aguilar-Spinelli* test. Although the reports of informants # 1 and # 3 and part of informant # 2's report were based on statements made by third parties, which are inherently less reliable than firsthand observations, the Court also believes that there is good reason for equally crediting these reports. In all three cases, the informant received information from a third party which would implicate that person in criminal activity: (1) Adolphus Hall told informant # 1 that he was delivering heroin to Johnson for sale in Chester; (2) Easton told informant # 2 that the heroin which he was receiving

from Johnson was stored in an apartment complex in northern Delaware; and (3) a drug dealer named Steven Dale told informant # 3 that he was expecting a shipment of heroin from Hudnell in the near future. All of these statements, albeit hearsay, were in the nature of admissions against penal interest, thus strengthening their trustworthiness sufficiently to convince the magistrate that he was relying on something more substantial than a casual rumor or an accusation based on mere suspicion. *See Spinelli v. United States, supra,* 393 U.S. at 425, 89 S.Ct. at 593 (White, J., concurring); *United States v. Main, supra,* 312 F.Supp. at 739; *cf., Agnellino v. State of New Jersey,* 493 F.2d 714, 726 (C.A.3, 1974).

The Court believes that the second prong of the *Aguilar-Spinelli* test, the establishment of the credibility of each informant, also was met by the affidavit at issue in this case. The affidavit specifically alleges that each of the informants previously had provided information to the Chester police which had led to the seizure of drugs and the arrest and conviction of certain narcotics traffickers. Consequently, the magistrate could reasonably find cause to believe that the three informants were credible and, by extrapolation, that the information they provided on this occasion was reliable. *See United States ex rel. Hurley v. Delaware,* 365 F.Supp. 282, 287 (D.Del.1973).

██ Although the informants' reports, considered in isolation, would be insufficient to establish probable cause, when amplified by the other factual allegations in the affidavit, the circumstances described are such as to justify the issuance of the search warrant. The affidavit, by way of introduction, asserts that West controls most of the heroin sold in Chester, Pennsylvania, that his confederates are Johnson, Hudnell, Easton and Michael Bell, and that numerous informants have told the police that West obtains his heroin in the form of New York Quarters on a weekly basis from New York. Although these conclusory statements ordinarily would be entitled to no weight in appraising the sufficiency of the affidavit, specific information corroborating these statements is provided and there is a substantial basis for crediting the inference that West, Johnson, Hudnell, Easton and Hall were each jointly involved either directly or indirectly in the trafficking of heroin. *See United States v. Scott, supra,* 555 F.2d at 527. In his meeting with the undercover police officer, West admitted that he was engaged in selling heroin and that his suppliers were located in New York. That same month, Hall told informant # 1 that he was going to deliver packages of New York Quarters to Johnson, who allegedly was West's "second-in-command," for sale in Chester. In August, 1980, informant # 2 advised the police that Johnson was distributing large quantities of heroin in the form of New York Quarters to Easton, who allegedly was one of West's heroin dealers, in Chester. The deliveries were made by Johnson in a red corvette registered to Adolphus Hall. Informant # 3, moreover, advised the police that on December 5, 1980, a drug dealer in Chester, Pa., stated that he was expecting a shipment of heroin from Larry Hudnell, another purported West operative, in the near future. That same day, Agent Glanz observed West enter Hall's apartment where he remained a mere eight minutes and then followed him to a Rest Stop just north of the Pennsylvania state line where West had a suspicious one minute meeting with a person who the magistrate could reasonably presume was Hudnell. In addition, West was a frequent visitor to Hall's apartment and Johnson had also visited there on at least one occasion. At that time, Johnson came out of Hall's building and drove off in West's van. Finally, beyond these assertions, the affidavit demonstrates that West, Easton and Hudnell all had previous convictions for drug related offenses, a factor which may permissibly be considered by a magistrate in making a probable cause determination. *See United States v. McNally, supra,* 473 F.2d at 940.

Similarly, enough suspicion was focused on Hall's residence for the magistrate reasonably to conclude that it was the probable site of the heroin cache. *See United States*

*v. Chester, supra,* 537 F.2d at 176. Besides the facts alleged above, the affidavit indicates, through informant # 1's report, that heroin had been stored at Hall's previous apartment on Peachtree Road in early 1980. In August 1980, informant # 2 was advised by Easton that the heroin stash was located in an apartment in northern Delaware. West's suspicious meeting with Hudnell at the Rest Stop in Pennsylvania, moreover, was held shortly after he had departed Hall's apartment. A prudent, diligent police officer, guided by his experience and training in the *modus operandi* of narcotics traffickers, could have concluded that it was likely that West transferred some heroin to Hudnell at this meeting, which West had taken from Hall's apartment.

Admittedly, the conclusion that the items to be seized were located at Hall's apartment does not rest on any firsthand observations of heroin being taken into or out of the apartment. Contrary to West's assertion, however, an affidavit need not contain information providing to a certainty that the objects sought will be found as a result of the search. It is only necessary that the facts and circumstances support the determination that the residence is the *probable* site of the items sought, which determination may be reached through any logical inferences or deductions. *See United States v. Scott, supra,* 555 F.2d at 527; *United States v. Maestas,* 546 F.2d 1177, 1180 (C.A.5, 1977); *United States v. Trott, supra,* 421 F.Supp. at 554.

The Court also rejects West's contention that most of the information contained within the affidavit was too stale to support a finding of probable cause. The issue of staleness of probable cause depends upon the nature of the unlawful activity alleged in the affidavit and not on the particular dates and times specified therein. *United States v. Scott, supra,* 555 F.2d at 528; *United States v. Harris,* 482 F.2d 1115, 1119 (C.A.3, 1973). As observed by the Third Circuit Court of Appeals:

> Initially, it should be noted that the validity of probable cause cannot be qualified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit. Together with the element of time we must consider the nature of the unlawful activity. Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant.

*United States v. Harris, supra,* 482 F.2d at 1119, *quoting, United States v. Johnson,* 461 F.2d 285, 287 (C.A.10, 1972). The illegal activity alleged in this case is not an isolated narcotics transaction, but a moderately sized narcotics distribution organization engaged in protracted and systematic operations in Chester, Pennsylvania. The inclusion in the affidavit of facts occurring over the year-long period, rather than dissipating an initial suspicion of likely criminal activity, supports the allegation of continuous criminal conduct by the participants described in the affidavit. The Court thus finds that the facts relied upon in the affidavit are not too remote in time to support a finding of probable cause.

### C. Overbreadth

The search warrant issued in this case authorized a search of Harbor House Apartments, 281 Harbor Drive, Apartment # 10 and *any storage area.* Defendant West contends that because Building 281 of the Harbor House Apartments is a multi-unit building which contains storage areas for each individual apartment, the failure to designate the applicable storage area to be searched is fatal to the validity of the search warrant. This argument is wholly without merit.

In order to satisfy the dictates of the Fourth Amendment, a search warrant must describe with particularity the premises to be searched. Generally, if the description is such that the officer can with "reasonable effort ascertain and identify the place intended," the warrant will be

sustained. *United States v. Bedford*, 519 F.2d 650, 655 (C.A.3, 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed. 323 (1976), *quoting, Steele v. United States No. 1*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925). The standard is simply one of practical accuracy. *United States v. Bedford, supra*, 519 F.2d at 655. "Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

■ Reasonably construing the warrant in a common sense and realistic fashion, it is obvious that the police had authorization to search only that storage area specially designated for tenants of Apartment # 10. The warrant at hand, accordingly, is not overbroad.

## II. *West's Arrest*

Defendant West also argues that the police and federal agents were without probable cause to arrest him and accordingly seeks suppression of all evidence taken from his person and statements made by him in conjunction with his warrantless arrest. West was arrested on December 11, 1980 immediately before the police officers executed the search warrant of Hall's apartment which was procured two days earlier on December 9, 1980. At the time, police had instituted a continuous stake-out of the apartment and anticipated that West or Johnson would be picking up heroin from the apartment as needed. Plans were made to effect the arrest of West or Johnson as he left the apartment and then serve the warrant.

At 1:25 p. m. on December 11, 1980, Special Agent Boulden of the DEA observed West's van arrive and park near Hall's apartment. West entered the building where he remained approximately 10 minutes. After he emerged and started to enter his van, he was arrested by Agent Boulden. A key in West's possession was used by police to enter the apartment and West was taken inside. Subsequently, West directed the officers to a briefcase in the apartment containing 960 New York Quarters of heroin which he later stated he had brought back from New York that morning. In addition, approximately 30 New York Quarters of heroin were taken from West's coat pocket.

■ Unlike searches of a residence which ordinarily require a warrant, an arrest may be made in a public place without the necessity of a warrant so long as the arresting officer has probable cause to believe that the person to be arrested was engaged in the commission of a felony. *United States v. Watson*, 423 U.S. 411, 417–18, 96 S.Ct. 820, 824–25, 46 L.Ed.2d 598 (1976). In this case, the government argues that the information outlined in the search warrant affidavit is sufficient in itself to justify a reasonable belief that West was stashing heroin in Hall's apartment for distribution in Chester. In addition, the government claims that information received as a result of investigative and surveillance activity conducted after the warrant was issued and before West's arrest further supports the determination of probable cause to make the arrest. On the evening of December 10, 1980, an informant who had given Chester police information which had led to ten or more previous narcotics convictions advised them that he had made periodic visits to the area in Chester where West's heroin was sold and was informed that West's dealers were out of supply. Previous information received by the Chester Drug Unit had indicated that West picked up heroin from his suppliers in New York when he had sold his last delivery. Agent Glanz and officers of the police department appropriately concluded that West would soon travel to New York to replenish his supply. That same evening, West's van was observed headed north on Route 95 in Chester, and the police concluded that West was on his way to New York.

■ When coupled with the information contained in the search warrant, the Court finds that the facts and circumstances leading up to the December 11, 1980 arrest, were sufficient to establish probable cause to believe that West was engaged in a

felony. Accordingly, West's motion to suppress all evidence emanating from his arrest is denied.

An Order will be entered in accordance with this Memorandum Opinion.