**UNITED STATES of America, Plaintiff,**

v.

**Gabriel deJesus MARTINEZ, et al., Defendants.**

**Crim. A. No. 85–61–JJF.**

United States District Court,
D. Delaware.

Dec. 10, 1985.

Richard J. McMahon, Asst. U.S. Atty., Wilmington, Del., for plaintiff.

Victor F. Battaglia, and J. Michael Johnson, of Biggs & Battaglia, Wilmington, Del., Attorneys for defendant Martinez.

Thomas R. Hunt, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant Seaver.

James L. Patton, Jr., of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant Demestichas.

Daniel A. Durkin, Wilmington, Del., for defendant Totora.

OPINION

FARNAN, District Judge.

This matter comes before the Court on defendant Gabriel DeJesus Martinez's (hereinafter "Martinez") Motion to Suppress the fruits of a warrantless search of a parked aircraft. Martinez is charged with possession with intent to distribute marijuana (21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2), importing marijuana (21 U.S.C. § 952(a) and 18 U.S.C. § 2), and conspiracy with intent to distribute and conspiracy to import marijuana (21 U.S.C. § 846 and 18 U.S.C. § 2). These charges stem from an incident on October 4–5, 1985, at the Wilmington Airport, during which in excess of 50 kilograms of marijuana were seized and Martinez was arrested. Pursuant to the Motion, suppression hearings were held on November 12 and November 22, 1985. During the hearings, the defendant did not present any evidence, deciding to rely on evidence elicited from the government's witnesses. Defendant Martinez's Motion is denied based on the findings of fact and conclusions of law stated herein.

FINDINGS OF FACT

On October 4, 1985, Airport Security Officer Rand Townley ("Townley") was on duty at the Wilmington Airport. As a security officer employed by New Castle County, Townley has the power to arrest, and to tow illegally parked aircraft. He is generally responsible for maintaining peace and order at the airport. Transcript of November 12, 1985 (hereinafter Tr. I) at pp. 4–7. At approximately 11:30 p.m., Townley was informed that Russell Becker ("Becker") at Bear Delivery was trying to reach him. Tr. I at 6. Bear Delivery receives freight flown from Detroit for Chrysler and General Motors (Tr. I at 6).

When Townley arrived at Bear Delivery, a Beech 18 aircraft was parked with its front wheels on the pavement and its rear wheel in the grass. *Id.* Becker told Townley that the aircraft was not making deliveries to Bear Delivery, that the pilot had asked permission to park on the ramp at Bear Delivery, and that another Bear De-

livery employee had taken the pilot to the Kings Inn. Tr. I at 6. Because the ramp was in the control of Wilmington Airport, and therefore of Townley (Tr. I at 15), and because overnight parking is not permitted on ramps, Townley prepared to tow the aircraft (Tr. I at 7).

Airport regulations require that aircraft parked overnight in unauthorized areas, i.e. anywhere other than the terminal ramp or Atlantic Aviation, be towed. The airport has a contractual arrangement with Atlantic Aviation that provides for towing. The normal procedure calls for the security officer to enter the aircraft to check that the brake is released. The brake must be released to prevent damage during towing. Tr. I at 9–10.

Townley approached the aircraft to prepare it for towing. While standing on the ground at the rear of the aircraft, Townley shone his flashlight through the side window. Tr. I at 7, 17. Townley noted that the aircraft contained many bundles (Tr. I at 7), about three feet by one and one-half feet by one and one-half feet. Tr. I at 35. None of the bundles appeared to contain the customary airbills or manifests. Tr. I at 7. He also observed "green plant-like material" inside the aircraft about two feet away from him. Tr. I at 18, 33. The material covered an area approximately five inches by one-half inch, in between two stacks of bundles. Tr. I at 33. Townley estimated the quantity of the material was sufficient for one cigarette. *Id.* The material was not in leaf form, but appeared plant-like in its color and texture. Tr. I at 18–19. Townley testified it resembled chopped cigarette tobacco, except the pieces were larger. Tr. I at 19. Townley concluded that the plant-like material was marijuana because it looked like marijuana he has seen at the New Castle County Police Headquarters. Tr. I at 19–20. Based on these observations, Townley radioed the New Castle County Police Department for assistance, and requested a supervisor. Tr. I at 8.

Sergeant Handley Orr, a Street Supervisor with the New Castle County Police, Department, was the first officer to arrive. Tr. I at 8, 43. Orr had worked as an undercover agent in the Drug Control Unit from 1970 through 1972. Tr. I at 43. When Orr arrived, Townley explained his conversation with Becker, that the aircraft was illegally parked and had to be towed, and his observations that led him to believe the aircraft contained marijuana. Tr. I at 8, 44–45.

While standing on the ground, Orr smelled an odor of marijuana near the cargo door of the aircraft (Tr. I at 45), and observed many bundles (Tr. I at 60). Orr observed more bundles when he stepped on the wing of the aircraft. Id. Orr noticed that one of the bundles on the top of a stack had a torn corner, about one and one-half to three inches in diameter, on which there was no paper (Tr. I at 61; Tr. II at 25), and through which he observed a green plant material protruding (Tr. I at 45, 56–57, 60). The tear was not a cut or a slit, but appeared to be a rupture caused by being thrown or bumped. Tr. I at 61. Orr does not recall whether he observed the torn bundle while he was on the ground or on the wing. Id.

At Orr's request, Townley unlocked the aircraft using a master key supplied by his employer. Tr. I at 8, 22. After the door was opened, Townley also smelled the odor of marijuana. Tr. I at 8, 45. Orr entered the plane alone. Id. While inside, he noted that the odor of marijuana was stronger, and that a green residue of plant material was on the floor by the doorway. Tr. I at 45, 62. Orr inspected the package with the torn corner and "felt" it contained marijuana. Id. He counted twenty-seven packages weighing approximately sixty pounds each. Tr. I at 57. He did not seize anything, however, he did have Townley secure the plane, i.e. lock the door. Tr. I at 45–46; Tr. II at 25, 33.

After Orr's inspection of the aircraft, he had Townley notify the U.S. Customs Service, and he also requested that the County Police Detective Division have a detective report to the site. Tr. I at 46. While awaiting the detective's arrival, Orr learned from another New Castle County patrol officer, who had also responded to the scene, that the pilot was at the General Wayne Motel. Id. Orr sent the patrol officer to the motel to attempt to locate the pilot. Id.

After searching the aircraft, Townley took the tail number to determine to whom it was registered. At that point, he noticed the third character, a numeral two, was newer and larger than the other three characters. Townley determined from microfiche records at the terminal building that the number was fictitious. Tr. I at 8.

Detective James R. Hedrick ("Hedrick") arrived at the site of the aircraft at approximately 11:50 p.m. Transcript of November 22, 1985 (Tr. II) at p. 24. Orr and Townley recounted their observations to Hedrick. Tr. II at 25. Hedrick then examined the interior of the plane, while standing on the ground. Id. He noticed a bale near the door with a small tear in the corner, "about the size of a fifty cent piece or a little larger" with what appeared to him to be marijuana protruding from it. Id.

After the door was opened for him, Hedrick looked inside and saw small particles of what appeared to be marijuana on the floor at the rear of the aircraft. He also smelled what he believed to be marijuana. Id. After his inspection, Hedrick had Townley secure the door again. Tr. II at 26.

Hedrick interviewed Becker, the Bear Delivery employee who had initially contacted Townley about the illegally parked aircraft. Becker advised Hedrick that the pilot requested permission to leave the plane on the ramp for a short time and said he could not tell Becker the contents of the cargo. Tr. II at 26.

Hedrick, another detective, and Orr commenced a surveillance of the aircraft. Tr. I at 46; Tr. II at 26. A group of officers was stationed at a facility approximately one-quarter of a mile from the aircraft. Two more officers were sent to the General

Wayne Motel to determine the pilot's room number and begin a surveillance there. Tr. II at 27. Orr and a Customs Agent also participated in the motel surveillance. Tr. I at 47.

Approximately forty-five minutes after Orr arrived at the motel surveillance site, two vehicles, a Capri and a white rental van, arrived at the pilot's room. Tr. I at 49; Tr. II at 28. Both vehicles left the motel after a short time, and proceeded north on Route 13. Tr. I at 47. Orr and another officer followed the vehicles. *Id.* Meanwhile, at about 3:00 a.m., Hedrick was advised that the vehicles had departed the motel. Tr. II at 28. The vehicles took more than forty-five minutes to find their way back to the airport gate where the aircraft had been parked. Tr. I at 47.

The Capri remained at the gate with one person standing nearby. The rental van parked on the left side of the aircraft, near the cargo door. Tr. I at 48; Tr. II at 28.

Orr remained near the gate to continue his surveillance of the Capri. Tr. I at 48. Hedrick and the officers surveilling the aircraft could observe the Capri and the man near it, as well as the van, the aircraft, and the three men in the van. Tr. II at 28.

After the three men with the van unloaded about five of the bales from the aircraft, Hedrick signalled for all of the surveillance officers to close in. Tr. I at 48; Tr. II at 28. Orr approached the airport gate in his car, and identified himself to the man near the Capri. The man ran through the gate and toward the aircraft. Other officers apprehended him near the airplane. Tr. I at 49. That man was later identified as Gabriel DeJesus Martinez.

The three men who were unloading the aircraft, one of whom was later identified as the pilot, were apprehended in the vicinity of the aircraft and van. Tr. II at 29. Customs Officer John Murphy ("Murphy") assisted in the apprehension of the pilot, Arthur Seaver. Tr. II at 5. Hedrick arrested another man, Ronald J. Totora. Tr. II at 29. Another officer arrested the third participant, James C. Demestichas. Tr. II

at 21. Between the time of the arrests, about 3:00 a.m., and 3:17 a.m., Murphy advised all four arrestees of their *Miranda* Rights. Tr. II at 5.

Within about two minutes of the time the officers and Customs agents arrived at the aircraft, a Customs agent slit open one of the bales to inspect the contents. Tr. II at 9. Murphy conducted a cursory search of the Capri and the aircraft. Tr. II at 22. He seized from the Capri "some notes and some line drawings of Limerick Airport, also some pages torn out of an AOPA manual, showing Limerick Airport and the approaches and the frequencies." Tr. II at 22. Murphy left two radios and two beacons in the Capri. Tr. II at 23.

After daybreak, and thus after the arrests, the battery was removed from the aircraft. Tr. I at 29; Tr. II at 8, 11, 33. There is no evidence that the fuel was drained before or after the arrests. See Tr. II at 7–8, 33. The only "immobilizing" activity was Townley's re-locking of the door when Orr and Hedrick ordered him to secure the aircraft (Tr. I at 46; Tr. II at 26, 33).

The two motor vehicles were towed to a fenced-in area, a sally port, at the rear of the New Castle County Police Headquarters. Tr. II at 31. A private company towed them, with Hedrick following the van and another officer following the Capri. *Id.* The sally port has an electronic gate controlled by the House Sergeant. Customs agents inspected the Capri while it was at police headquarters, seized the lights, and gave them to Hedrick to temporarily place in the County Police Evidence Unit. Tr. II at 31.

The aircraft was towed to the rear of the airport terminal building, where it was stored. Tr. I at 30.

The four arrestees received new Miranda warnings after they arrived at County Police headquarters. Tr. II at 29, 30. Only Totora and Demestichas gave statements. *Id.* Both men reported that Martinez recruited them to off-load marijuana at a Pottstown area airport (Limerick Airport).

The aircraft was forced to land at the Wilmington Airport, and they received directions to Wilmington. *Id.*

All four men were indicted for possession with intent to distribute marijuana, importing marijuana and conspiracy to possess with intent to distribute and to import marijuana. All defendants, except Martinez, have pled guilty.

## CONCLUSIONS OF LAW

I. *Martinez Had No Privacy Interest in the Aircraft and its Contents.*

■ The right of people "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures" is guaranteed by the Fourth Amendment of the United States Constitution. This substantive right to legitimately expect privacy in one's property and person is protected by the requirement that searches be conducted pursuant to search warrants issued by a neutral magistrate. *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverthorne Lumber Company v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed.2d 319 (1920). Where a search is performed without such a search warrant, it must fall within one of the recognized exceptions to this rule. If a court determines that the search was unconstitutional, then the fruits of that search must be suppressed in any criminal proceedings against those whose substantive rights to privacy were violated. *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

The ability of defendants to invoke the Fourth Amendment when a warrantless search produces incriminating evidence was, at one time, characterized as an issue of standing. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Supreme Court jurisprudence held that anyone charged with a crime as a result of the fruits of a warrantless search of which that person was the object, was "injured", and therefore had standing to raise the constitutionality of the search. *Jones,* 362 U.S. at 261, 263–65, 80 S.Ct. at 731, 732–33. However, in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court began to move away from an injury/standing analysis, and toward an analysis of the substantive right to privacy in the searched property. A defendant who asserted "neither a property nor a possessory interest" in either the property searched or seized, had no Fourth Amendment claim. *Rakas,* 439 U.S. at 148, 99 S.Ct. at 433. The Supreme Court completed the transition from the "automatic standing" rule when it specifically overruled *Jones* in *United States v. Salvucci,* 448 U.S. 83, 95, 100 S.Ct. 2547, 2554, 65 L.Ed.2d 619 (1980). Thus, a defendant now has the burden of proving that he/she had a "legitimate expectation of privacy" in the searched property. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *United States v. West,* 508 F.Supp. 1028, 1031 (D.Del. 1981).

Proof of a "legitimate expectation of privacy" requires more than proof of ownership of the property seized. *Rawlings,* 448 U.S. at 105, 100 S.Ct. at 2561 (ownership of drugs concealed in a third party's purse, insufficient evidence of a privacy interest in the purse); *Salvucci,* 448 U.S. at 91–93, 100 S.Ct. at 2552–53 (ownership of stolen checks seized in apartment of defendant's mother, insufficient evidence of a privacy interest in the apartment). Moreover, existence of a legitimate privacy interest is not based on the subjective expectations of the defendant. *United States v. Perez,* 644 F.2d 1299, 1303 (9th Cir.1981), citing *Rakas,* 439 U.S. at 143–44, n. 12, 99 S.Ct. at 430, n. 12. Furthermore, any proof of a privacy interest in the searched or seized property must be affirmatively established by the accused. *Id.,* citing *Rakas,* 439 U.S. at 148–49, 99 S.Ct. at 432–33.

After reviewing the testimony presented during the suppression hearing, the Court finds that Martinez has not carried his bur-

den of proving a privacy interest in the aircraft and its contents. He argues that three factors demonstrate his privacy interest: (1) the government's indictment alleges possession of the seized marijuana and a conspiracy relating to it; (2) a government witness, Sergeant Orr, on cross-examination, repeated statements by two of Martinez's co-defendants in which they stated he had recruited them to offload the drugs; and (3) Martinez fled from the police toward the aircraft when they attempted to apprehend him. Thus, Martinez argues that the government's own case clearly establishes his privacy interest in the aircraft and its contents.

Martinez's argument misinterprets current law. Since the *Jones* "automatic standing" principle was specifically overruled in *Salvucci*, the contents of an indictment, and elements necessary to prove those charges, are not evidence of a right to assert a Fourth Amendment claim. His argument also ignores the distinction between ownership of the property seized, and a legitimate expectation of privacy in the property searched. *Salvucci* and *Rawlings* make it clear that even positive proof of ownership of the seized property is insufficient evidence of a privacy interest in the searched property possessed by a third party.

If this Court were to accept as defendant's "proof", the contents of the indictment and the elements of the crimes charged, it would reach the results dictated by the *Jones* automatic standing analysis, albeit within the rubric of the *Rakas/Salvucci*, legitimate expectation of privacy analysis. To do so would be to engage in intellectual dishonesty.

Similarly, the defendant cannot use the counts of the indictment charging conspiracy, nor the government witness' recollection of statements made by two co-defendants, as proof that Martinez had a legitimate expectation of privacy in the aircraft. As indicated above, there is no proof of ownership of the marijuana in the record. Without such proof, the Court need not reach the issue of Martinez's privacy interest in the aircraft. He has not demonstrated he had any interest in the contents, therefore, he cannot prove an interest in the aircraft itself.

Furthermore, the Court has no evidence that Martinez entered into a formal bailor-bailee arrangement with the pilot, the presumed owner of the aircraft, from which it could imply he owned the marijuana. Martinez argues that the statements made by the two co-defendants, alleging he recruited them to offload the marijuana, proves both his ownership and that he had a bail-or-bailee relationship with the pilot. He erroneously relies upon *United States v. Johns,* 707 F.2d 1093 (9th Cir.1983), *reversed on other grounds,* 469 U.S. ——, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985), and on *United States v. Perez,* 689 F.2d 1336 (9th Cir.1982).

In *Johns,* the court found (1) that two pilots owned the seized marijuana, and (2) that they had a "formalized arrangement with the other five defendants for the transportation of the contraband." 707 F.2d at 1100. Similarly, in *Perez,* the court found (1) that the defendants owned the seized drugs, and (2) that it was "clear that a formalized arrangement had been made between (the defendants and the owner of the searched truck) for the transportation of the contraband." 689 F.2d at 1338. Thus, both courts concluded that the defendants had legitimate expectations of privacy in the searched vehicles.[1]

These cases are distinguishable from the facts in Martinez's case. Here, there is no

---

**1.** Neither opinion states whether the defendants presented any evidence at the suppression hearing. However, the detail with which the drug transactions were described in the written opinions, indicates that the courts in *Johns* and *Perez* had more affirmative evidence of ownership and of "formalized agreements" than the testimony of the government witness upon whom Martinez relied. Further, the *Johns* court indicated that two defendants had asserted ownership during the suppression hearing when it noted that the government had acquiesced on the issue of continuing ownership. *Johns,* 707 F.2d at 1100, n. 6. Thus, the Court concludes

evidence of ownership of the marijuana. If Sergeant Orr's recitation of Totora's and Demestichas' allegations that Martinez recruited them to transport the marijuana were taken as "proof of a formalized arrangement", then it would only prove an arrangement between Martinez and Totora and Demestichas. There is no evidence who owned the marijuana, Martinez, the pilot, or an unknown third party, nor is there any evidence who hired whom as between the pilot, Martinez, and possibly an unknown third party. Therefore, Sergeant Orr's testimony at trial does not provide Martinez with sufficient evidence to convince the Court that he has carried his burden of proof.

Finally, the fact of Martinez's flight towards the aircraft when confronted by Sergeant Orr may support the existence of a conspiracy, but has no bearing on the issues of ownership of the marijuana and his privacy interest in the aircraft.

Based on the foregoing, Martinez has not carried his burden of proving that he has a legitimate expectation of privacy in the searched aircraft. *Rawlings*, 448 U.S. at 104, 100 S.Ct. at 2561; *West*, 508 F.Supp. at 1031. Thus, a warrantless search of the aircraft and seizure of the marijuana did not implicate his Fourth Amendment rights. However, even if Martinez were able to prove that he had a privacy interest in the aircraft, the government has carried its burden of proving that the warrantless search and seizure did not violate the Fourth Amendment.

II. *The Warrantless Search of the Aircraft and Seizure of the Contraband did not Violate the Fourth Amendment.*

■ Although the Fourth Amendment warrant clause generally requires that all searches and seizures be performed pursuant to a warrant issued by a neutral magistrate, the Supreme Court has recognized certain exceptions to the warrant requirement. *See Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); and *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). When contraband is within the "plain view" of a police officer, a search and seizure for which probable cause existed, based on the officer's having seen the contraband, does not implicate the Fourth Amendment. *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1985). Any search resulting from the observation of the contraband is constitutional if it does not exceed the scope that could have been authorized by a search warrant. *United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982). Where a warrantless search is conducted based on the "plain view" doctrine, the fact that the contraband was in "plain view alone is never enough to justify the warrantless seizure of evidence." *Coolidge v. New Hampshire,* 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971). Thus, the *Coolidge* court held that observation of an item comports with the "plain view" doctrine when (1) it can be seen by a police officer from a lawful vantage point; (2) its "incriminating nature" is "immediately apparent"; and (3) it was "inadvertently discovered" by the police. *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 1540, 75 L.Ed.2d 502 (1985), citing *Coolidge,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The observation of the marijuana in the interior of the aircraft by Officer Townley and Sergeant Orr comported with

---

that in both of those cases the defendants, through their own testimony or that of their witnesses, presented affirmative evidence on which the courts made their findings. Even if they did not, this Court interprets *Salvucci* and

*Rawlings* to require a defendant to present more evidence on the issue of a legitimate expectation of privacy in the property searched than was provided by Sergeant Orr's testimony.

the plain view doctrine as enunciated in *Coolidge* and applied in *Brown.*

When Officer Townley first observed the marijuana, he was inspecting the interior of the aircraft from the ground through a window. His inspection was in preparation for his planned towing of the aircraft from its illegal parking place. Even if he had inspected the interior of the aircraft due to his mere curiosity, the intrusion would have been lawful. In *Brown*, the Supreme Court held that a "diligent police officer" was not precluded from assuming any position to observe the interior of a vehicle which a curious private citizen might, and that no legitimate expectation of privacy protected items that "would be entirely visible to . . . a private citizen." 105 S.Ct. at 1542. Thus Townley's inspection which first revealed the possible presence of marijuana inside the aircraft, was a lawful intrusion conducted from a lawful vantage point.

Likewise, Sergeant Orr's initial inspection did not constitute an unlawful intrusion, and was not conducted from an improper position. Sergeant Orr smelled the odor of marijuana while on the ground by the cargo door. He observed packages which, based on the totality of the circumstances (that is the late night arrival of the aircraft, the request to park at a warehouse located away from the terminal building and the public parking area, and the sight of green plant-like material protruding from one of the bundles), appeared to him to contain marijuana.

Martinez argues that the initial intrusions were illegal because of the use of flashlights by Townley and Orr, and because Orr possibly observed the torn package while standing on the wing. The Supreme Court recently held that an Officer's "action in shining his flashlight to illuminate the interior of [a vehicle] trenched upon no right secured to the [defendant] by the Fourth Amendment." *Texas*, 103 S.Ct. at 1541. Therefore, the use of lights to illuminate the interior of the aircraft did not trigger Fourth Amendment protection. *See also Brown*, 103 S.Ct. at 1541 n. 5, citing cases.

When determining whether an officer's position on a wing constituted an illegitimate vantage point, the Sixth Circuit in a similar case applied a totality of the circumstances test. *United States v. Bellina*, 665 F.2d 1335, 1344 (4th Cir.1981). In *Bellina*, the court found that (1) a plane's heavy damage suggested an attempt may have been made to land at a nearby unlighted airfield, rather than the lighted airfield at which the pilot finally set down, (2) the seats had been removed, suggesting the transportation of cargo, and (3) the pilots had left the plane without explaining the damage or requesting information on repairs, were such significant facts to a Customs Officer experienced in drug investigations, that failure to diligently inspect would have been a dereliction of his duty. 665 F.2d at 1345. The court held, therefore, that the officer's standing on the wing did not constitute an unconstitutional intrusion or an unlawful vantage point.

Here, Officer Townley unambiguously testified that he observed green plant material while on the ground. Thus, Orr's inspection from the wing is not dispositive of the applicability of the plain view doctrine. However, even if it were, his inspection from the wing was not from an unlawful vantage point. As in *Bellina*, Orr was an experienced drug investigator. He knew that the aircraft had been landed in a remote area of the airport, rather than in the public area near the terminal building. He knew that the pilot did not know where to stay, and had no one to transport him to a motel. From the ground, Orr observed stacks of bundles and smelled a strong odor of marijuana. He mounted the wing for a better look into the aircraft. As the Sixth Court concluded in *Bellina*, Orr would have ignored his duty to diligently inspect the scene of a suspected crime if he had not mounted the wing. Therefore, it is irrelevant whether he noticed the torn package with protruding green plant material from the ground or from the wing. Thus, both officers' inspections constituted lawful intrusions made from legal vantage points.

The second criterion of the plain view doctrine, that the incriminating nature of the item observed be "immediately apparent" to the inspecting officers, was met. The immediately apparent criterion does not require officers to *know* the observed items "are contraband or evidence of a crime", but requires the officers to have probable cause to believe that they are. *Brown,* 103 S.Ct. at 1542 (citations omitted). Both officers had the following knowledge when they observed the green plant material in the plane: (1) the pilot had chosen to land and illegally park at a remote portion of the airport rather than in the public parking area; (2) the aircraft did not contain cargo destined for the warehouse at which it had parked; (3) green plant-like material had been or was being transported within the plane. In addition, Sergeant Orr smelled the odor of marijuana. Officer Townley testified that he had examined the visible parts of the packages for air bills and found none. Thus, the Court concludes that the officers had probable cause to believe that the contents of the packages were marijuana. The Court having reached this conclusion, holds that the second criterion of the plain view doctrine was met.

Although the continued viability of the third criterion of the plain view doctrine has been questioned, *Brown,* 103 S.Ct. at 1543, n. 8, citing cases, the requirement that the incriminating evidence be "inadvertently discovered" was also satisfied. Evidence is inadvertently discovered when officers have no advance knowledge of the location of the evidence and no intent to seize it. *Coolidge,* 403 U.S. at 470, 91 S.Ct. at 2040, *cited in Brown,* 105 S.Ct. at 1543. An expectation that evidence will be discovered is not sufficient knowledge. *Id.* Orr did not know Townley's suspicions until he arrived at the airport. Even if he had, an officer's suspicions are not sufficient knowledge of the presence of incriminating evidence to defeat the inadvertence requirement.

Therefore, the Court concludes that the warrantless search of the aircraft and sei-

zure of the contraband comported with the requirements of the plain view doctrine, and thus did not violate the Fourth Amendment.

Martinez also argues that the plain view doctrine was not met because the search and seizure were not made under exigent circumstances. In determining whether a warrantless seizure violates the Fourth Amendment, the Court must determine whether the warrantless search and seizure were constitutional at the time the initial search was conducted. *United States v. Johns,* 105 S.Ct. 881, 885–87. *See also, United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, *Michigan v. Thomas,* 458 U.S. 259, 260, 102 S.Ct. 3079, 3080, 73 L.Ed.2d 750 (1982). The Court concluded earlier that the totality of the circumstances surrounding the aircraft's presence at a remote part of the airport and the observations made by Townley and Orr provided the necessary elements to establish probable cause to search and seize the aircraft. At the time the initial search occurred, the aircraft was fully mobile. Although the pilot had been transported to a motel, the officers had no means of knowing when the pilot would return, or whether other confederates of the pilot were in the area. Therefore, at the time the initial search occurred, exigent circumstances were present.

Finally, even if the facts did not support the legitimacy of the search and seizure of the aircraft and of its contents, the recently adopted Supreme Court doctrine of inevitable discovery would prevent the suppression of the fruits of the illegal search and seizure. *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). The court stated that "When ... the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there was no nexus sufficient to provide a taint and the evidence is admissible." 104 S.Ct. at 2511. Officer Townley's testimony clearly proves that the marijuana would have been discovered

as soon as he entered the plane to prepare it for towing. Martinez did not challenge Townley's legal right to enter an illegally parked airplane to prepare it for towing.

Also, the government argues that agents of the Customs Service would have seized the aircraft because it had a false tail number, further indicating that the marijuana would have been inevitably discovered by the authorities. However, as Martinez correctly notes, Townley did not notice the tail number was pasted over until after the initial search of the aircraft. There is no testimony on the record from which the Court could conclude that Officer Townley would have checked the tail number as a routine part of preparing the aircraft for towing. Therefore, the Court cannot conclude that Customs would have inevitably discovered the marijuana. This, however, does not change the conclusion that the inevitable discovery doctrine prevents the suppression of the evidence because Officer Townley, a sworn peace officer with arrest powers, would have discovered the marijuana as soon as he entered the plane to prepare it for towing.

Having reviewed the facts surrounding the warrantless search and seizure of the aircraft and of its contents, the Court concludes that if Martinez had had a legitimate expectation of privacy in the aircraft, his Fourth Amendment rights would not have been violated.

## CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of Law, the Court finds that Martinez did not have a legitimate expectation of privacy in the aircraft, *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and that the search and seizure of the aircraft and the marijuana comported with the requirements of the Fourth Amendment, *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Therefore, Martinez's Motion to Suppress the fruits of the search and seizure of the aircraft will be denied.